[No. S017917. Dec. 19, 1991.]

RICHARD J. RIDER et al., Plaintiffs and Respondents, v.
COUNTY OF SAN DIEGO et al., Defendants and Appellants.

4

**COUNSEL**

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace and Diane Bardsley, Chief Deputy County Counsel, Bruce D. MacLeish and Andrew J. Freeman, Deputy County Counsel, McDougal, Love, Eckis, Grindle & O'Connor, Lynn R. McDougal and Tamara A. Smith for Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Jack T. Kerry and Edmond B. Mamer, Deputy Attorneys General, Kelvin H. Booty, Jr., County Counsel (Alameda), James F. May, Assistant County Counsel, Susan Minasian, County Counsel (Butte), Max E. Robinson, County Counsel (Fresno), John E. Slutter, Deputy County Counsel, James P. Lough, County Counsel (Humboldt), Thomas M. Fries, County Counsel (Imperial), Kevin E. Ready, Deputy County Counsel, Bernard C. Barmann, County Counsel (Kern), Stephen D. Schuett, Assistant County Counsel, Cameron L. Reeves, County Counsel (Lake), De Witt W. Clinton, County Counsel (Los Angeles), David L. Muir, Deputy County Counsel, Jeffrey L. Kuhn, County Counsel (Madera), Douglas J. Maloney, County Counsel (Marin), Allen A. Haim, Deputy County Counsel, James S. Reed, County Counsel (Mono), Ralph R. Kuchler, County Counsel (Monterey), Leroy W. Blankenship, Deputy County Counsel, James A. Curtis, County Counsel (Nevada), Robert Shulman, County Counsel (Plumas), William C. Katzenstein, County Counsel (Riverside), Lee B. Elam, County Counsel (Sacramento), Robert A. Ryan, Deputy County Counsel, Alan K. Marks, County Counsel (San Bernardino), Michelle D. English, Deputy County Counsel, Steven M. Woodside, County Counsel (Santa Clara), Karen Heggie, Deputy County Counsel, Dwight L. Herr, County Counsel (Santa Cruz), David R. Frank, County Counsel (Shasta), Frank J. DeMarco, County Counsel (Siskioyu), James P. Botz, County Counsel (Sonoma), Stephen Dietrich, Jr., County Counsel (Tuolumne), James L. McBride, County Counsel (Ventura), Melodie M. Kleiman, Assistant County Counsel, James P. Jackson, City Attorney (Sacramento), Theodore H. Kobey, Jr., Assistant City Attorney, Diane B. Balter, Deputy City Attorney, Gray, Cary, Ames & Frye, David E. Monahan, Kenneth S. Klein, Walter & Pistole, Jeffrey A. Walter, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Steven L. Mayer, Remcho, Johansen & Purcell, Charles C. Marson, Robin B. Johansen, Gibson, Dunn & Crutcher, John A. Arguelles, Richard G. Duncan, Jr., Jeffrey T. Thomas, Georgia Vanites Hogan, Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer, Winfield D. Wilson,

Parker, Covert & Chidester, Clayton H. Parker, O'Melveny & Myers, Holly E. Kendig, Richard M. Jones, Thomas G. Hungar, Orrick, Herrington & Sutcliffe and Paul A. Webber as Amici Curiae on behalf of Defendants and Appellants.

Louis S. Katz, Thomas F. Homann, Carl Fabian, Ellen D. Geis, Stephen J. Perrello, Jr., Gregory Marshall and Lewis A. Wenzell for Plaintiffs and Respondents.

Trevor A. Grimm, Ronald A. Zumbrun, Anthony T. Caso and Jonathan M. Coupal as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

## LUCAS, C. J.—

### INTRODUCTION

In this case we consider, among other issues, a question previously left open (see *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 208 [182 Cal.Rptr. 324, 643 P.2d 941] [hereafter *Richmond*]) regarding the validity of a taxation scheme enacted for the apparent purpose of avoiding the supermajority voter approval requirement imposed by a 1978 initiative measure (Prop. 13) with respect to any "special taxes" sought to be imposed by "cities, counties and special districts" (see Cal. Const., art. XIII A, § 4 [hereafter section 4]). At issue here is the validity of a sales tax (retail transaction and use tax) imposed on sales occurring in San Diego County (hereafter the County) for the purpose of financing the construction and operation of criminal detention and/or courthouse facilities (hereafter justice facilities) for the County. We conclude the tax is invalid because it was not approved by at least two-thirds of the County's voters, as required by section 4.

In 1987, in express recognition of the County's need for improved courtrooms and jails, the Legislature passed an act (Gov. Code, §§ 26250-26285) creating the San Diego County Regional Justice Facility Financing Agency (hereafter the Agency) and setting forth the Agency's obligations. Under the act, the Agency was charged with adopting a tax ordinance imposing a supplemental sales tax of one-half of 1 percent throughout the County for the purpose of financing the construction of justice facilities. (*Id.*, §§ 26267, 26271-26275.) The act provided for a countywide election held for the purpose of approving the tax ordinance by simple majority vote. (*Id.*, §§ 26271, 26273.) The act also provided that the Agency possesses no tax power other than the foregoing sales tax. (*Id.*, § 26283.)

At an election held in June 1988, the County's voters approved the tax ordinance by a bare (50.8 percent) majority vote. Plaintiffs, being County taxpayers, filed the present suit to challenge the validity of the tax. (See Code Civ. Proc., § 863.) As pertinent here, the complaint asserted the tax violated the supermajority vote requirements of both section 4 and Government Code sections 53720-53730 (added by Prop. 62, discussed below). Prior to trial, the tax went into operation; tax revenues have been collected and accumulated pending final decision.

The trial court found in plaintiffs/taxpayers' favor, concluding the tax constituted a deliberate and unavailing attempt to circumvent section 4 and its requirement of two-thirds voter approval of special taxes imposed by special districts such as the Agency.

The Court of Appeal disagreed and reversed the trial court's judgment declaring the tax invalid. The appellate court acknowledged that the act creating the Agency "gives the Agency *no* significant governmental discretion . . . with respect to *how* the tax revenues will be spent. In this case, it is distressingly clear that the Agency is nothing more than an empty shell through which the Board of Supervisors of the County of San Diego can exercise *its* discretion." Nonetheless, deeming itself bound by *Richmond*, the Court of Appeal reasoned that section 4 is inapplicable to districts such as the Agency which have no power to levy a property tax. The appellate court further concluded that application to the Agency of a similar statutory supermajority voter approval provision in Government Code section 53722 would be improper as an attempted local tax referendum.

As will appear, we conclude (1) the Court of Appeal erred in holding the provisions of section 4 were inapplicable to the Agency's tax, (2) the tax was invalid for failure to secure the requisite two-thirds voter approval, and (3) accordingly we need not reach the question of the effect, application, or validity of Government Code section 53722.

## DISCUSSION

█ We have observed that section 4, although written in permissive terms, was intended to circumscribe the taxing power of local government. (See, e.g., *Richmond, supra,* 31 Cal.3d at p. 201.) In pertinent part, the section provides that "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

As we stated in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281] (hereafter *Amador*), upholding the validity of Proposition 13, "since any tax savings resulting from the operation of sections 1 and 2 [the property tax rate and assessment limitations of the measure] could be withdrawn or depleted by additional or increased state or local levies of other than property taxes, sections 3 [providing that increased *state* taxes require legislative approval by a two-thirds vote] and 4 combine to place restrictions upon the imposition of such taxes."

In other words, section 4's restriction on local taxes is part of an "interlocking 'package' deemed necessary by the initiative's framers to assure effective real property tax relief." (*Amador*, *supra*, 22 Cal.3d at p. 231.) Plaintiffs' primary argument is that the Court of Appeal's decision herein undermines Proposition 13 by presenting cities, counties and other governmental entities with a ready means of avoiding its limitation on new taxes.

*Richmond*, *supra*, 31 Cal.3d 197, concerned the validity of a sales tax imposed by the Los Angeles County Transportation Commission (LACTC), an entity created in 1976 *prior* to the adoption of Proposition 13. The enabling act authorized LACTC to impose the tax once the measure was approved by a majority of the county's voters; LACTC was not empowered to levy a tax on real property. After 54 percent of the voters approved the measure, the question arose whether the supermajority voter approval provision of section 4 was applicable. We concluded it was not applicable.

We focused on the subsidiary issue whether the LACTC was a "special district" within the meaning of section 4. We found that term ambiguous, having been given varying interpretations in prior cases and statutes. Stressing the "fundamentally undemocratic nature" of supermajority vote requirements (31 Cal.3d at p. 205), we resolved the ambiguity by applying to section 4 a rule of *strict construction* in favor of upholding the tax. (*Ibid.*) We concluded that an agency lacking the power to impose a tax on real property could not be deemed a special district. (*Id.* at pp. 205-206.)

Relying on portions of the voters' pamphlet, we determined that Proposition 13 was aimed at property tax relief, and that section 4 thereof was intended to restrict the ability of local taxing agencies to impose new taxes to *replace* the loss of property tax revenue arising from the tax rate and assessment restrictions of that measure. The plurality opinion of Justice Mosk reasoned that "Since only those 'special districts' which levied property taxes could 'replace' the 'loss' of such taxes, these statements [in the voters' pamphlet] imply that the 'special districts' referred to are those which

are authorized to levy a property tax." (*Richmond, supra*, 31 Cal.3d at p. 206; see also *id.* at pp. 208-209 [conc. opn. by Kaus, J.].) Because LACTC had no such power, it could not be deemed a "special district" within the meaning of section 4.

In dissent, Justice Richardson observed that the majority's analysis in *Richmond* could be used to readily circumvent the supermajority vote requirement of section 4 "by the simple creation of a district which is geographically precisely coterminous with a county, but which lacks its real property taxing power. . . . The majority has cut a hole in the financial fence which the people in their Constitution have erected around their government. Governmental entities may be expected, instinctively, to pour through the opening seeking the creation of similar revenue-generating entities in myriad forms which will be limited only by their ingenuity." (31 Cal.3d at p. 213 [dis. opn. by Richardson, J.].)

The dissent took the position that the phrase "special district" applies to any governmental agency "formed . . . for the local performance of governmental or proprietary functions within limited boundaries" (Gov. Code, § 50077, subd. (d) [implementing Prop. 13]). As the dissent observed, LACTC sought to impose a sales tax to generate funds for ordinary public services that could as readily have been funded by a county real property tax, but for the limitations of Proposition 13. (31 Cal.3d at pp. 212-213 [dis. opn. by Richardson, J.].) Consequently, LACTC must be deemed a "special district."

In response to the dissent's prediction of future circumvention of section 4, the *Richmond* plurality stated, "We cannot assume that the Legislature will attempt to avoid the goals of article XIII A by such a device. In any event, *that problem can be dealt with if and when the issue arises.* The legislation creating LACTC and granting it the power to levy only a sales tax antedated Proposition 13 by two years. Thus, there can be no claim here that the Legislature was attempting to evade the restrictions imposed by section 4." (31 Cal.3d at p. 208, italics added.) We reaffirmed the *Richmond* analysis in *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 106-107 [211 Cal.Rptr. 133, 695 P.2d 220].

Unlike the situation in *Richmond, supra,* 31 Cal.3d 197, in the present case the trial court expressly found that "Proposition 13 has been purposely circumvented" by the act which formed the Agency, in that the Agency "was created solely for the purpose of avoiding the strictures of Proposition 13." In addition, as previously noted, the Court of Appeal deemed the Agency "an empty shell" used by the County to exercise its own fiscal discretion. The record amply supports those findings.

In 1985, the San Diego County Board of Supervisors began considering the possibility of a sales tax increase to obtain additional funds for the County's justice facilities, and in 1986 legislation was passed (former Gov. Code, §§ 26250-26263) authorizing such a tax increase, and calling for the creation of a special county fund for administering and operating those facilities. An election was held in November 1986 to secure the voters' two-thirds approval of the new sales tax, as required by section 4. The measure failed, however, being supported by only 51 percent of the voters.

Thereafter, as an alternative method of raising funds for the County's justice facilities, the board of supervisors directed a local legislator to introduce legislation creating a "limited purpose special district" (the Agency) with limited tax powers, to impose a one-half cent sales tax increase upon approval by the County's voters. The initial version of the bill named the County's entire board of supervisors as the Agency's board of directors. The Legislative Counsel thereafter advised against creating such a close relationship between the Agency and the County, and the final version included only two county supervisors among the seven Agency directors. The County, however, retained substantial control over operations and expenditures, and the act required compliance with the County's master plan. Territorially, the Agency's boundaries are coterminous with the County's. Although the Agency may hold title to land and facilities, it must convey title thereto to the County on request of the County's board of supervisors.

After the tax scheme had been "approved" in June 1988 by 50.8 percent of the County voters, the Agency began operations, hiring several County employees for its staff and incurring expenses paid from funds advanced by the County. The tax went into effect on January 1, 1989. According to plaintiffs, approximately $200 million has been accumulated to date; it is anticipated that $1.6 billion in revenues will be raised during the Agency's 10-year term.

Having found that the Agency was created to circumvent Proposition 13, and that the Agency is properly deemed a "special district" under section 4, the trial court further found that the Agency's proposed sales tax is a "special tax" under that section because the tax proceeds were not to be spent for general County purposes but for the special and limited purposes of constructing and operating the County's justice facilities. (See *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 57 [184 Cal.Rptr. 713, 648 P.2d 935].) As previously indicated, the Court of Appeal considered *Richmond* controlling and did not reach the special tax issue. We consider both issues.

1. *Special District*

■ We conclude that the Agency must be deemed a "special district" under section 4, despite its lack of power to levy a tax on real property. To hold otherwise clearly would create a wide loophole in Proposition 13 as feared by the dissent in *Richmond.* As we explained in *Amador,* the evident purpose of section 4 was to "assure effective real property relief" by imposing restrictions on "additional or increased state or local levies other than property taxes . . . ." (22 Cal.3d at p. 231.) *Richmond, supra,* 31 Cal.3d 197, 205-206, makes section 4 inapplicable to special taxes levied by local districts which, prior to the passage of Proposition 13, lacked the power to levy real property taxes. The Court of Appeal decision herein would extend *Richmond* to *any* local district or agency, whenever created, which lacks such power, even if purposefully formed for the sole purpose of circumventing section 4. We are convinced the framers of, and voters for, Proposition 13 did not intend that section 4 be construed in such a manner.

As the Court of Appeal herein acknowledged, plaintiffs/taxpayers are correct in observing an "increase in the number of revenue-generating governmental entities which lack the power to assess property taxes. . . . [T]here are now numerous 'justice facility financing agencies' (such as the Agency herein) which have been given life by the state Legislature [citing provisions for creating such facilities in seven other counties]. Further, . . . a generalized provision (Rev. & Tax. Code, § 7285.5) . . . permits 'rural' counties . . . to establish 'an authority for specific purposes' with the power to assess a sales tax (a transaction and use tax) of one-half of one percent (0.5 %)." (We note that in 1990, the procedures authorized by the foregoing section were extended to *all* counties.)

In addition, plaintiffs/taxpayers note that the Legislature has authorized the counties to create special transportation districts, funding their programs exclusively through increased sales taxes (e.g., Pub. Util. Code, §§ 131000 et seq., 180000 et seq.). But for the potential implications of our holding in *Richmond,* the counties arguably would be required to obtain two-thirds voter approval to fund such projects.

The Agency and the County cite cases supporting the general rule that the possible improper motivations of the Legislature or its members in passing legislation are immaterial to questions involving the validity of such legislation. (E.g., *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 726-727 [119 Cal.Rptr. 631, 532 P.2d 495].) They further doubt that plaintiffs/taxpayers have demonstrated any improper legislative intent in creating the Agency, and they dispute plaintiffs' suggestion that the Agency is merely the "alter ego" of the County.

As previously indicated, the record amply supports the trial court's finding of "purposeful circumvention." But we are less concerned here with the factual support for the trial court's finding than with the probable intent of the framers of section 4 of Proposition 13. We must attempt to determine whether the framers, in using the term "special district," intended to adopt a definition that could so readily permit circumvention of section 4. The fact that, following *Richmond, supra,* 31 Cal.3d 197, numerous "special purpose" districts were created to accomplish aims comparable to LACTC strongly indicates a large "hole" has indeed been created in Proposition 13, confirming Justice Richardson's prediction. In our view, the framers of Proposition 13, and the voters who adopted it, would not have intended that result.

It seems evident that *Richmond*'s limitation of the term "special district" to those districts possessing property tax power is unworkable as applied to districts formed after the adoption of Proposition 13, because to our knowledge *no* such agencies possess that power. With limited exceptions, only *counties* are empowered to levy the 1 percent maximum property tax allowed by Proposition 13. (See Rev. & Tax. Code, former § 2237, now § 93, subd. (a); *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 331 [182 Cal.Rptr. 506, 644 P.2d 192].) In other words, as a practical matter, the proposed extension of *Richmond* to all districts, whenever created, which lack property tax power would read section 4's reference to "special districts" out of existence as applied to districts formed after 1978.

As the plurality opinion in *Richmond* explained, section 4 of Proposition 13 was intended to restrict the ability of local governments to impose new taxes to replace property tax revenues lost under the other provisions of that measure. (See 31 Cal.3d at p. 206.) This intent would be frustrated if cities and counties were nonetheless permitted to arrange for the formation of local taxing districts to finance municipal functions without securing the requisite two-thirds voter approval.

Thus, we hold that "special district" would include any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13.

In the present case, the evidence that the Agency was created to raise funds for county purposes and thereby circumvent Proposition 13 is strong. In future cases, however, marshalling such evidence of intentional circumvention may be difficult. Thus, we believe that courts may infer such intent whenever the plaintiff has proved the new tax agency is *essentially controlled* by one or more cities or counties that otherwise would have had to comply with the supermajority provision of section 4. In determining

whether such control exists, a variety of considerations may be relevant, including the presence or absence of (1) substantial municipal control over agency operations, revenues or expenditures, (2) municipal ownership or control over agency property or facilities, (3) coterminous physical boundaries, (4) common or overlapping governing boards, (5) municipal involvement in the creation or formation of the agency, and (6) agency performance of functions customarily or historically performed by municipalities and financed through levies of property taxes.

The "essential control" standard posited above is not necessarily the functional equivalent of the "alter ego" theory used to "pierce the corporate veil" for purposes of imposing liability on the individual shareholders. (See, e.g., *Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 300-301 [216 Cal.Rptr. 443, 702 P.2d 601].) Rather than attempting to demonstrate that the subject agency and county are *identical* entities, application of the "essential control" test simply affords ground for reasonably inferring an intent to circumvent Proposition 13.

*Vanoni* v. *County of Sonoma* (1974) 40 Cal.App.3d 743, 748-751 [115 Cal.Rptr. 485], serves as an instructive analogous precedent. There, the appellate court considered whether a water district should be deemed the alter ego of a county for purposes of applying the constitutional debt limitation applicable to cities, counties and school districts, but not to water districts. (Cal. Const., former art. XIII, § 40; see *id.*, art. XVI, § 18.) The court observed that although the county and water district shared common boundaries, governing boards, citizens and taxable property, and the district was performing functions traditionally performed by counties (40 Cal.App.3d at pp. 748-749), the district remained a separate legal entity not subject to the debt limitation in the absence of a showing "the entity subject to the limitation [i.e., the county] *controlled the decision to incur the debt or levy the tax.*" (*Id.* at p. 750, italics added.)

As *Vanoni* concluded, "Although the Sonoma Water District may be performing functions traditionally performed by counties, appellants have offered no evidence, beyond the fact that the same individuals sit on the governing boards of both the county and the water district, *that Sonoma County exercises actual control over the actions of the district.* The fact that the same individuals are members of both boards is not sufficient to establish that control. [Citation.]" (*Vanoni* v. *County of Sonoma, supra,* 40 Cal.App.3d at pp. 750-751, italics added.) We agree with *Vanoni* that common governing boards do not invariably indicate county control, but certainly that fact is relevant to the inquiry. The determination whether a city or county essentially controls a taxing agency is one that necessarily must be made on a case-by-case basis, using the criteria suggested above.

We are unconvinced that application of the "essential control" standard would necessarily jeopardize all taxing agencies created since 1978. As plaintiffs observe, the statutes establishing such agencies and providing for the adoption of tax ordinances typically contain strict time limitations governing commencement of litigation challenging their validity. (See, e.g., Gov. Code, § 26282 [pertaining to the San Diego County agency involved herein]; Code Civ. Proc., §§ 860 [in rem validation procedure], 863 [60-day statute of limitations for challenging validity of agency action].) Unlike curative acts, which generally are unable to cure *constitutional* defects (see *Hoffman* v. *City of Red Bluff* (1965) 63 Cal.2d 584, 592 [47 Cal.Rptr. 553, 407 P.2d 857]; *Aughenbaugh* v. *Board of Supervisors* (1983) 139 Cal.App.3d 83, 90-91 [188 Cal.Rptr. 523]), such statutes of limitations are deemed within legislative power to provide a prompt validating procedure for asserting such challenges (see *Rand* v. *Bossen* (1945) 27 Cal.2d 61, 64-67 [162 P.2d 457]; *Graydon* v. *Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 645-646 [164 Cal.Rptr. 56]). Thus, although we do not decide the point here, some tax districts, and the taxes they have collected, may be unaffected by our holding.

We likewise leave open the question of a possible prospective application of our holding to agencies other than the Agency involved herein. The issue of prospectivity involves difficult constitutional and policy considerations largely unbriefed in this case. In addition, resolution of the prospectivity issue may depend on a variety of case-specific factors, including the degree of hardship or other adverse consequences that would result from a retroactive application of our holding in a particular setting. Under these circumstances, we believe that any blanket pronouncement on the prospectivity issue at this time would be inappropriate.

2. *Special Tax*

The conclusion that the Agency is a "special district" under section 4 does not end our analysis, for by its terms that section is applicable only to "special taxes" imposed by cities, counties and special districts. The Agency urges us to hold that its sales tax is a general tax because its revenues are not earmarked for any special purposes *within the Agency*, but are to be placed in the Agency's general fund for "the general governmental purposes of the agency . . . ." (See Gov. Code, § 26272.) As we explain, consistent with the trial court's conclusion, we hold that a special tax is indeed involved here: tax revenues are being collected for the *special* and *limited* governmental purposes of constructing and operating the County's justice facilities (see *id.*, § 26267 [outlining the Agency's specific duties]). The Court of Appeal did not reach the issue.

In *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47 (*Farrell*), we addressed the meaning of the phrase "special taxes" in section

4. The City and County of San Francisco (the City) had imposed a payroll and general receipts tax, the proceeds of which were to be placed in the City's treasury to be used for general governmental expenditures. Because the tax had been approved by a mere majority of the City's voters, a question arose as to the application of section 4.

The *Farrell* majority observed that "special taxes" was an ambiguous term that has been given varying interpretations, but that applying settled interpretive principles (including *Richmond*'s rule of strict construction), the term as used in section 4 means "taxes which are levied for a specific purpose rather than, as in the present case, a levy placed in the general fund to be utilized for *general governmental purposes*." (32 Cal.3d at p. 57, italics added.) Because the City's payroll tax revenues were to be used for general City expenses, the tax was deemed a "general" one beyond the reach of section 4.

Justice Richardson again dissented, believing the majority "widens still further the hole which they have cut in that protective fence which the people of California thought they had constructed around their collective purse" by adopting Proposition 13. (*Farrell, supra,* 32 Cal.3d at p. 57 [dis. opn. by Richardson, J.]; see also *id.* at pp. 58-59 [dis. opn. by Kaus, J., construing "special taxes" to mean " 'new,' 'additional,' or 'supplemental' taxes which are enacted to replace tax revenue lost as a result of Proposition 13's limitation on the property tax"].) Justice Richardson observed the *Farrell* rationale would allow a municipality to recover completely any property tax revenues lost under Proposition 13 merely by enacting an alternative form of taxation, the revenues of which being earmarked for general governmental purposes. (*Id.* at p. 58 [dis. opn. by Richardson, J.].)

We believe the *Farrell, supra,* 32 Cal.3d 47, rationale does not extend to limited purpose agencies such as the Agency herein. To hold that a tax cannot be deemed a "special tax" if revenues thereof are deposited in the taxing agency's general fund pulls any remaining teeth from section 4's restriction on special taxes. As previously indicated, the trial court applied *Farrell*'s test and nonetheless concluded that the Agency's sales tax was indeed a "special tax" because its revenues were earmarked for the specific purpose of funding the County's justice facilities, and not for "general governmental purposes."

The Agency and the County argue, however, that because the Legislature expressly designated the Agency's tax as a "general tax" (Gov. Code, § 26251; see *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161] [presumption favoring legislative construction of Constitution]), and because the sales tax revenues are to be used

for the Agency's "general governmental purposes" (Gov. Code, § 26272), the tax should be deemed a general tax, exempt from the restrictions of section 4. Again, if we are to preserve the spirit, if not the letter, of Proposition 13, we must disagree.

First, with respect to defendants' reliance on the Legislature's designation of the tax as a "general tax," such nomenclature is of minor importance in light of the realities underlying its adoption and its probable object and effect. (See *Douglas Aircraft Co., Inc.* v. *Johnson* (1939) 13 Cal.2d 545, 550 [90 P.2d 572] [legislative designation of nature of tax entitled to "some weight" but not conclusive].) The statute at issue was undoubtedly drafted with section 4 and *Farrell's* (*supra*, 32 Cal.3d 47) holding firmly in mind.

Nor can we accept defendants' "general fund" argument. It is undisputed that if the County had directly adopted the tax in question, earmarking its revenues for the special, limited purpose of financing the County's justice facilities, it would have been deemed a "special tax" under *Farrell*. As plaintiffs observe, it would be anomalous if the "special" tax of one agency could so readily become the "general" one of another. Under defendants' proposed test, the Legislature could readily avoid section 4's supermajority voter approval requirement by simply creating a local taxing agency to accomplish a specific, narrow governmental purpose (e.g., lifeguard towers for county beaches), and provide that tax revenues shall be deposited in the agency's "general fund" for the "general governmental purposes" of that agency.

A more reasonable interpretation of section 4, consistent with *Farrell's* (*supra*, 32 Cal.3d 47) guidelines, is that a "special tax" is one levied to fund a specific governmental project or program, such as the construction and financing of the County's justice facilities. It is true that, under the foregoing principle, *every* tax levied by a "special purpose" district or agency would be deemed a "special tax." But this interpretation seems most consistent with the probable intent of the framers of Proposition 13.

### 3. *Proposition 62*

In addition to their arguments under Proposition 13, plaintiffs/taxpayers contended that the Agency's tax is an invalid "special tax" under the supermajority voter approval provisions of Proposition 62, a statutory initiative measure adopted in 1986. Because we hold that the Agency's sales tax offends Proposition 13, we (like the trial court herein) need not reach plaintiffs' alternative arguments under Proposition 62.

### 4. *Subsidiary Objections to Trial Court Order*

The Agency, the County, and some amici curiae, including the State Board of Equalization, have raised on appeal several additional issues regarding

uncertain or questionable aspects of the trial court's order, including its award of attorney fees, its remedy of reducing the County's combined sales tax rate and enjoining further tax collection, its failure to provide for distribution of sales taxes already collected, and its determination of the County's liability for the Agency debts incurred in contravention of the court's order. The Court of Appeal passed on none of these subsidiary issues, and it is appropriate that we remand for an initial determination thereof by that court, consistent with our opinion.

## CONCLUSION

We are sympathetic to the plight of local government in attempting to deal with the ever-increasing demands for revenue in the post-Proposition 13 period, and we are especially reluctant to interfere with sorely needed projects for new and improved courtrooms, criminal detention facilities, and other justice facilities. Yet Proposition 13 and its limitations on local taxation are constitutional mandates of the people which we are sworn to uphold and enforce. Any modification of these mandates must come from the people who, by constitutional amendment, may adopt such changes by a simple majority vote. (Cal. Const., art. XVIII, § 4.)

The judgment of the Court of Appeal validating the Agency's tax levy is reversed and that court is directed to resolve any remaining appellate contentions of the Agency and the County consistent with our opinion.

Arabian, J., Baxter, J., and George, J., concurred.

**GEORGE, J.,** Concurring.—I concur in the majority's conclusion that the sales tax at issue in this case is a "special tax" that may validly be imposed only if approved by a two-thirds vote of the local electorate. Although I have signed the majority opinion, I write separately to explain why, in my view, the court's decision in this case should be premised on the *statutory* provisions of Proposition 62, rather than on the *constitutional* provisions of Proposition 13. As I explain, basing our decision on nonconstitutional grounds not only would be more consistent with well-established principles of judicial restraint, but would avoid the necessity of placing a new "gloss" on the meaning of the term "special district" as interpreted in prior decisions of this court construing Proposition 13, a gloss that appears likely to engender considerable confusion and litigation and that will cause difficulty in applying the majority's holding in future cases.

I

In this case, plaintiff taxpayers contend that the sales tax in question is invalid because it was not approved by a two-thirds vote of the local

electorate. Plaintiffs maintain that a two-thirds vote is required under both Government Code section 53722, a provision of Proposition 62, and article XIII A, section 4 of the California Constitution (hereafter article XIII A, section 4), a provision of Proposition 13. The majority opinion turns immediately to an analysis of the proper interpretation of article XIII A, section 4, without considering whether the tax is invalid under the applicable provision of the Government Code.

In my view, the majority's approach is inconsistent with well-established principles of judicial restraint. In his celebrated concurring opinion in *Ashwander* v. *Valley Authority* (1936) 297 U.S. 288, 347 [80 L.Ed. 688, 711, 56 S.Ct. 466], Justice Brandeis, in reviewing a number of settled precepts of judicial practice, observed that "[t]he Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. [Citations.]" California courts have long subscribed to this principle. (See, e.g., *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 66 [195 P.2d 1] [" 'It is a well-established principle that this Court will not decide constitutional questions where other grounds are available and dispositive of the issues of the case.' "]; *People* v. *Barton* (1963) 216 Cal.App.2d 542, 546 [31 Cal.Rptr. 7].) I believe we should adhere to this settled maxim and evaluate the validity of the challenged tax under the statutory provisions of Proposition 62, reaching the question of the tax's constitutionality under the provisions of Proposition 13 only if it is necessary for us to do so.

II

Proposition 62, an initiative measure drafted in response to a number of judicial decisions construing the earlier adopted Proposition 13 (see, e.g., *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935] (hereafter *Farrell*); *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941] (hereafter *Richmond*)), was enacted into law by the voters at the November 1986 General Election. This initiative added a new article to the Government Code, comprised of a number of related statutory provisions governing the imposition of both general and special taxes by local governmental entities. (See Gov. Code, §§ 53720-53730.) The legislation that created the local agency at issue here, and that authorized the agency to impose the challenged tax, was adopted less than a year after the voters' enactment of Proposition 62. (Stats. 1987, ch. 1258, §§ 1-4, pp. 4471-4477.)

Plaintiffs contend that the tax at issue is invalid under one of the principal provisions of Proposition 62, Government Code section 53722.[1] That section provides in full: "No local government or district may impose any special tax unless and until such special tax is submitted to the electorate of the local government, or district and approved by a two-thirds vote of the voters voting in an election on the issue."

For the reasons discussed below, I believe that plaintiffs' contention is well founded. Indeed, in my view, the provisions of Proposition 62 provide a much clearer and more straightforward basis for the decision in this case than the provisions of Proposition 13, on which the majority opinion relies.

To begin with, it is clear beyond dispute that section 53722 applies to the local agency that imposed the tax in this case—the San Diego County Regional Justice Facility Financing Agency (hereafter the Agency). Unlike the comparable provision of Proposition 13 (art. XIII A, § 4), which by its terms applies only to cities, counties and "special districts," a phrase that has been given a narrow interpretation by prior decisions of this court (see, e.g., *Richmond, supra,* 31 Cal.3d 197, 201-208; *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 106 [211 Cal.Rptr. 133, 695 P.2d 220]), section 53722 applies to all "local government[s]" or "district[s]." Section 53720, the initial provision of Proposition 62, defines these terms broadly: "As used in this Article: [¶] (a) 'local government' means any county, city, city and county, including a chartered city or county, or any public or municipal corporation; and [¶] (b) *'district' means an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries.*" (Italics added.)

Because of the breadth and clarity of the applicable statutory language, there is no question but that the Agency is a "district" subject to the provisions of section 53722. In contrast to the determination whether the Agency is to be considered a "special district" within the meaning of Proposition 13 under the interpretation set forth in the majority opinion (see maj. opn., *ante,* pp. 10-13), there is no need to inquire into the purpose for which the Agency was established or to determine whether the Agency is "essentially controlled" by another local governmental agency, in order to determine whether the Agency is subject to the limitations of section 53722. Thus, reliance on section 53722 in this case and in future cases would avoid entangling courts in the difficult inquiries that inevitably will follow from the majority opinion's holding with regard to the meaning of the term "special district" in Proposition 13.

---

[1] Hereafter, all section references are to the Government Code unless otherwise specified.

Furthermore, under the terms of Proposition 62, I believe it is equally clear that the tax at issue here is a "special tax" within the meaning of section 53722. Unlike Proposition 13, which contains no explicit definition of the term "special tax" as used in that measure (see *Farrell, supra*, 32 Cal.3d 47, 53-57), Proposition 62 does contain a specific provision directed to this point. Section 53721 provides: "All taxes are either special taxes or general taxes. General taxes are taxes imposed for general governmental purposes. Special taxes are taxes imposed for specific purposes."

Under this controlling statutory definition, I conclude that the sales tax challenged in this case is a special tax. As the majority opinion explains, the tax was imposed for the specific purpose of financing the construction of justice facilities in the county, and the proceeds from the tax are earmarked for this specific purpose. Although the legislation creating the Agency purported to designate the tax as a "general tax" (see § 26251) which would require only a majority, rather than a two-thirds, approval of the local electorate under Proposition 62 (see § 53723), in light of the very narrow scope of the Agency's authority—limited to only one specific governmental activity, the construction of justice facilities—this tax cannot, in my view, properly be said to have been imposed for "general governmental purposes" within the meaning of section 53721, notwithstanding the deference that usually is accorded the Legislature's interpretation of governing provisions.[2] The tax in question plainly is of the kind, "imposed for [a] specific purpose[]" (§ 53721), that Proposition 62 contemplated would be treated as a special tax.

Accordingly, because the Agency that imposed the tax clearly is subject to the provisions of section 53722, and because equally clearly the tax in question is a special tax within the meaning of this section, I conclude that under section 53722 the tax was not validly enacted since it was not approved by the requisite two-thirds vote of the local electorate.

---

[2]Contrary to the argument of defendant and its supporting amici curiae, this conclusion does not mean that *any* tax imposed by *any* special district or local agency invariably will be a special tax. Some special districts or agencies may have broad enough authority over a sufficient number of different subject areas that a tax whose proceeds are not earmarked for a specific purpose and are to be deposited in the district's general fund may properly be considered a general tax. When such multipurpose local districts are involved, the legislative designation of a tax as a general, rather than a special, tax may be significant.

Given the narrow authority and purpose of the Agency in this case, however, a conclusion that the tax at issue here is a general tax would effectively read the distinction between general and special taxes out of section 53721. Proposition 62 clearly did not intend to give the Legislature the authority to transform what would otherwise clearly be a special tax into a general tax, simply by creating a specialized agency and directing that the proceeds of the tax be paid into that agency's "general" fund.

III

Defendant contends, however, that even if the tax at issue is inconsistent with the requirements of section 53722, the inconsistency is of no moment because this statute is itself unconstitutional. Defendant argues that insofar as section 53722 requires a local government to obtain prior approval of the local electorate before imposing a special tax, the statute improperly authorizes a local tax referendum and thereby assertedly violates the provisions of article II, sections 9, subdivision (a) and 11 of the California Constitution (hereafter article II, sections 9(a) and 11).[3] Although the Court of Appeal in this case agreed with defendant's contention, in my view the Court of Appeal's conclusion rests on a misinterpretation of this court's decision in *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832 [313 P.2d 545] (hereafter *Geiger*).

In *Geiger*, *supra*, 48 Cal.2d 832, our court was faced with the question whether a county board of supervisors had acted lawfully in refusing to hold a referendum election on a local tax ordinance when a properly certified petition demanding such a referendum had been timely filed with the county prior to the effective date of the ordinance. In defense of its action, the county maintained that the constitutional referendum authority with respect to local legislation did not extend to local tax measures. Relying on the circumstance that the then-applicable constitutional provision—former article IV, section 1 of the California Constitution—specifically excepted "acts calling elections, *acts providing for tax levies or appropriations for the usual current expenses of the State*, and urgency measures" (italics added) from the reach of the referendum power applicable to *state* legislation, the county argued that a similar limitation was implicit in the constitutionally reserved referendum power applicable to *local* legislation.[4]

---

[3]Article II, section 9(a), provides in full: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State."

Article II, section 11, provides in full: "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide. This section does not affect a city having a charter."

[4]At the time *Geiger* was decided, article IV, section 1, provided in relevant part: "The second power reserved to the people shall be known as the referendum. No act passed by the Legislature shall go into effect until 90 days after the final adjournment of the session of the Legislature which passed such act, except acts calling elections, acts providing for tax levies or appropriations for the usual current expenses of the State, and urgency measures. . . . Upon the presentation to the Secretary of State within 90 days after the final adjournment of the Legislature of a [qualified] petition . . . asking that any act . . . of the Legislature be submitted to the electors for their approval or rejection, the Secretary of State shall submit [the matter] to the electors for their approval or rejection . . . and no such act . . . shall go

The *Geiger* court agreed with the county's contention, concluding that "the same exception [applicable to state referenda] applies to the referendum powers reserved to the county electors, and, therefore, the Constitution, standing alone, does not secure to county electors the right of referendum over tax levies or appropriations for the usual current expenses of county government." (*Geiger, supra,* 48 Cal.2d 832, 836.)

The plaintiffs in *Geiger* contended, however, that even if the constitutionally reserved referendum power did not, of its own force, extend to local tax measures, the Legislature, by several statutory enactments, had granted the local electorate the right to invoke the referendum with regard to tax measures. The *Geiger* court rejected the contention, finding no indication that the Legislature had intended to subject either local taxes in general, or the specific tax at issue in that case, to the referendum power. (*Geiger, supra,* 48 Cal.2d at pp. 837-839.)

Although this conclusion completely disposed of the plaintiffs' contention, the *Geiger* court, in dictum, went on to address the question whether the Legislature had the constitutional authority to expand the referendum power beyond the scope of the power reserved by the Constitution. The *Geiger* court indicated that in its view the Legislature did not have such power, stating: "The listing of exceptions in the Constitution amounts to a declaration of policy against subjecting legislation concerning the excepted matters to a vote of the people. While section 1 of article IV does not expressly prohibit the Legislature from extending the right of referendum to include a county sales tax ordinance, any holding that such measures are subject to referendum would be contrary to this policy and against the clear implication of the constitutional provision." (*Geiger, supra,* 48 Cal.2d at pp. 836-837.)

The Court of Appeal in the present case, relying on this broad language in *Geiger,* concluded that section 53722 is unconstitutional under article II, sections 9(a) and 11—the successor provisions to the constitutional provision at issue in *Geiger*—insofar as the statute requires a local government or district to obtain the approval of its electorate before imposing a tax. The Court of Appeal was of the opinion that under *Geiger* any statute that requires voter approval of a local tax is unconstitutional.

For a number of reasons, I disagree with the Court of Appeal's conclusion. First, as already noted, the broad language in *Geiger* on which the Court of

---

into effect until and unless approved by a majority of the qualified electors voting thereon. . . . The . . . referendum powers of the people are hereby further reserved to the electors of each county, city and county, city and town of the State to be exercised under such procedure as may be provided by law."

Appeal relied was clearly dictum, because in *Geiger* there was no statutory provision that purported to authorize the use of the referendum against a tax ordinance. The *holding* of *Geiger* was simply that *the referendum power reserved to the people by the state Constitution* with respect to local legislation, like the referendum power reserved by the Constitution with respect to state legislation, *does not extend to tax measures*. In view of the well-established principles concerning the breadth of the legislative power retained by the Legislature (see, e.g., *Collins* v. *Riley* (1944) 24 Cal.2d 912, 915-916 [152 P.2d 169]; *Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 234 [57 P.2d 510]), and the absence of any specific constitutional provision purporting to restrict the Legislature's authority to extend by statute the people's referendum power, I believe the broad dictum in *Geiger* is questionable.

Second, even assuming the dictum in *Geiger* were correct and should be followed, in my view that language would not apply to a statutory provision like section 53722. Unlike the hypothetical statute to which the *Geiger* dictum was addressed, section 53722 does not purport to subject local tax measures to the general referendum process, but rather imposes, as part of enabling legislation granting taxing authority to the local governmental entity, a voter-approval *precondition* that qualifies the local entity's fundamental authority to impose the tax. In contrast to a referendum, which is initiated by a petition signed by a relatively small percentage of the electorate and operates to suspend the effectiveness of a duly enacted legislative act that would otherwise go into effect of its own accord (see, e.g., *Whitmore* v. *Carr* (1934) 2 Cal.App.2d 590, 592 [38 P.2d 802]), the voter-approval provision of section 53722 is a legislatively mandated requirement that applies in every instance without initiation by the voters and is an essential prerequisite to the valid enactment of any tax measure to which the section applies.[5] The inclusion of such a condition precedent in enabling legislation is quite distinct from a referendum and, as explained hereafter, does not pose the same hazards of uncertainty for local fiscal affairs that the *Geiger* court found implicit in the exercise of the referendum power with regard to tax measures.

---

[5] In these respects, the voter-approval requirement of section 53722 is similar to the provisions of article XVI, section 18 of the California Constitution, which prohibit local governmental entities from "incurring any indebtedness . . . exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof . . . ."

In contrast, "[t]he referendum process allows the voters to veto statutes and ordinances enacted by their elected legislative bodies before those laws become effective. (*American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 713-714 [206 Cal.Rptr. 89, 686P. 2d 609].) Referenda do not enact law . . . ." (*Referendum Committee* v. *City of Hermosa Beach* (1986) 184 Cal.App.3d 152, 157 [229 Cal.Rptr. 51].)

The *Geiger* court, in concluding that the explicit limitations on the state-wide referendum power also applied to the local referendum power, explained the purpose underlying the relevant constitutional provision as follows: "One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies. The same reasoning applies to similar acts of a county board of supervisors . . . . Before the board can properly prepare a budget, it must be able to ascertain with reasonable accuracy the amount of income which may be expected from all sources, and, when it has adopted ordinances imposing taxes, it cannot make an accurate estimate unless it knows whether the ordinance will become effective." (*Geiger*, *supra*, 48 Cal.2d 832, 839-840.)

As this passage indicates, the *Geiger* court reasoned that while the constitutional referendum provision generally affords the electorate the authority to call for a referendum on any legislative act, the Constitution withholds the referendum power with regard to tax measures in recognition of the fact that when a legislative body establishes tax levels in connection with the budget process, the governmental entity must be able to rely on the receipt of those tax revenues and cannot have the viability of such measures continually placed in doubt by the possibility that a referendum may be initiated by a relatively small percentage of the electorate. (See also *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 629-630 [191 P.2d 426]; *Carlson* v. *Cory* (1983) 139 Cal.App.3d 724, 730 [189 Cal.Rptr. 185].) This reason for limiting the referendum power, however, does not apply to a voter-approval requirement that, under the governing statutes, constitutes an essential precondition to a local entity's authority to impose a particular tax. Because such a prior-voter-approval requirement always will be known in advance, the local legislative body will be aware that it lacks the power to levy the tax *until* voter approval has been obtained, and thus the local entity will not include the anticipated tax revenue in its enacted budget until after the electorate has approved the tax. Once such approval has been obtained, annual budget measures imposing the tax would be exempt from the referendum process, just like any other tax measure. (See Elec. Code, § 3751, subd. (a)(3); Gov. Code, § 25123, subd. (c) [tax ordinances take effect immediately].)[6]

To my knowledge, in the many years that have passed since the *Geiger* decision (*supra*, 48 Cal.2d 832), the limitations on the referendum power

[6]In *City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623, 627-631 [251 Cal.Rptr. 511], the Court of Appeal concluded that in light of the *Geiger* decision, a separate provision of Proposition 62—section 53727, subdivision (b)—could not constitutionally be applied to require local governmental entities to obtain voter approval of taxes that already

embodied in article II, sections 9(a) and 11, have not generally been understood to preclude the Legislature, in enacting enabling legislation in the tax field, from conditioning a local entity's taxing authority on prior voter approval of the tax. For example, in our decision in *Richmond, supra,* 31 Cal.3d 197, we noted in passing that the *1976* legislation that created the Los Angeles County Transportation Commission had conditioned the commission's authority to impose a tax on prior voter approval of the tax measure. (*Id.* at p. 199 [citing Pub. Util. Code, § 130354].) Indeed, in the very legislation that created the local agency involved in the case before us and granted that agency the authority to impose a one-half cent sales tax, the Legislature specifically conditioned the Agency's imposition of such a tax on the prior approval of a majority of the local electorate. (See § 26271.) Because the Legislature was willing to grant the Agency the authority to impose a tax only in the event the tax was supported by a majority of voters in a local election, if article II, sections 9(a) and 11, were interpreted to render unconstitutional any statutory provision imposing a voter-approval requirement with regard to a local tax, as defendant suggests, the Agency might well lose its statutory authority to impose *any* tax, even one approved by a two-thirds vote of the electorate. The other, numerous local governmental entities whose authority to impose a tax are similarly dependent upon voter approval might well suffer a similar fate. In view of the number of instances in which the Legislature has chosen to condition a grant of taxing authority to a local entity on the approval of the local electorate, the claim that the *Geiger* decision, *supra,* 48 Cal.2d 832, should be interpreted to preclude such legislation is untenable.

Accordingly, I conclude that section 53722, requiring a local government or district to obtain prior approval by the local electorate before imposing a special tax, is not unconstitutional under article II, sections 9(a) and 11.

## IV

Although for the foregoing reasons I believe it appropriate to base the decision in this case on the statutory provisions of section 53722 rather than on the constitutional provisions of Proposition 13, a majority of my colleagues do not share this view. I strongly believe that, whenever possible, we

were in place at the time Proposition 62 was enacted. Unlike section 53722, which establishes a precondition for the imposition of future taxes, section 53727, subdivision (b) operated more like a referendum, subjecting taxes that already had been validly enacted—and whose anticipated revenues had been taken into consideration by the affected local entities—to potential rejection by the voters. Accordingly, even if the *City of Westminster* decision was correct in applying the *Geiger* dictum to invalidate section 53727, subdivision (b), in my view the reasoning of that decision should not be extended to render invalid section 53722, which applies only to new taxes adopted after the enactment of Proposition 62.

should strive to decide the cases before us through authoritative opinions that command the support of a majority of the justices and thus serve as precedent for future cases. For this reason, and because I would agree with the majority opinion's conclusion that the enactment of the tax in question was invalid under Proposition 13 were I to believe it appropriate to reach that issue, I have joined the majority opinion.

Finally, although obvious, one additional comment appears appropriate. As judges, we are not free to disregard applicable statutory or constitutional requirements even when they impose formidable obstacles to the government's financial ability to meet pressing public needs. The provisions of Proposition 62 and Proposition 13 were enacted by the voters of this state, and under our constitutional system the remedy for any untoward consequences that flow from those provisions necessarily lies with the voters, not with the justices of this court.

Panelli, J., concurred.

**MOSK, J.—**

I

I dissent.

Although the majority opinion purports not to do so, it ignores stare decisis and effectively overrules our decisions in *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941] (hereinafter *Richmond*), and *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935] (hereinafter *Farrell*). It does so by limiting the holding of *Richmond* to entities established before Proposition 13 was enacted, a view of the decision no fair-minded reader could accept. As the Court of Appeal correctly observed, "*Richmond* is dispositive . . . . The Agency does not have the power to levy a property tax and consequently, is not a 'special district' subject to the provisions of section 4 [of article XIII A of the California Constitution]."

And, although they claim to abide by the distinction between a general and special tax made in *Farrell, supra,* 32 Cal.3d 47, the majority totally disregard that distinction by holding all taxes imposed by a district are special taxes, requiring a two-thirds vote for adoption.

The majority opinion, relying entirely on rejected contentions from two dissenting opinions filed almost 10 years ago, curiously fails to even mention an election held after *Richmond* and *Farrell* were decided. The voters

then rejected the interpretation of section 4 of article XIII A of the California Constitution (hereinafter section 4) that the opinion now advances and indicated their agreement with the conclusions in those two cases on the issue involved in the present proceeding. In addition, the majority disregard settled rules of construction, propound an unworkable test for determining whether the Legislature created a district for the purpose of circumventing section 4, and disregard language in both section 4 and the Government Code.

Finally, without a forthright determination that this opinion should apply prospectively only, the effect of the majority holding is likely to be devastating to local government entities and to those with whom they contract.

## II

In *Richmond*, we had before us the question whether the Los Angeles County Transportation Commission may impose a retail and use tax in Los Angeles County with the consent of a majority of the voters. Certain taxpayers claimed that under section 4, the commission was a "special district" that could impose a "special tax" only upon approval of two-thirds of the voters. We observed that section 4 is ambiguous, and stated that we had decided to interpret the term "special district" narrowly. "In view of the fundamentally undemocratic nature of the requirement for an extraordinary majority . . . , the language of section 4 must be strictly construed and ambiguities resolved in favor of permitting voters of cities, counties and 'special districts' to enact 'special taxes' by a majority rather than a two-thirds vote." (*Richmond, supra*, 31 Cal.3d at p. 205.) We held, without any reservation, that the term "special district," as used in section 4, refers only to those districts which may levy a tax on real property. All the justices except one in dissent concurred in the principle upon which our conclusion was based, i.e., that a district without the power to levy a tax on real property was not a "special district" under section 4 because that provision was aimed at prohibiting the "replacement" of "lost" property taxes with other taxes. This remained the law for nearly a decade—until today.

It is a distortion of *Richmond, supra*, 31 Cal.3d 197, to conclude, as do the majority, that the case was limited to local entities formed before 1978, when Proposition 13 was adopted. The comment at the end of the *Richmond* opinion upon which the majority rely (that the local agency therein could not have been created to evade the supermajority requirement of section 4 because it was formed prior to the adoption of that provision), cannot reasonably be viewed as confining the holding to such districts. The comment was not in any way a limitation of our holding, but was simply a

response to speculation that our opinion would open a loophole in the protection that article XIII A afforded to property owners.

The majority opinion repeats, apparently with approval, certain well-established principles that would require a result contrary to its holding, but fails to offer any reason why the principles are not binding. It simply disregards them in reaching its conclusions. For example, the majority recite the holding of *Richmond*, reiterated without demur in subsequent cases, that the elitist requirement for a supermajority is "fundamentally undemocratic," and that the language of section 4 must be strictly construed and ambiguities resolved in favor of permitting voters to enact measures by a majority vote. (*Richmond, supra,* 31 Cal.3d at pp. 202-205; see also *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 106 (maj. opn.), 110 (conc. & dis. opn. of Lucas, J.) [211 Cal.Rptr. 133, 695 P.2d 220]; *Farrell, supra,* 32 Cal.3d at p. 52; *Fenton* v. *City of Delano* (1984) 162 Cal.App.3d 400, 408 [208 Cal.Rptr. 486].) Nevertheless the majority's construction of section 4 violates this unequivocal rule. Rather than interpreting the section narrowly, the majority interpret it expansively to accommodate the minority of the electorate that has an objection to local tax measures. With this opinion, tax relief to a minority has overwhelmed the democratic principle of majority rule.

I fail to see how the question whether a governmental body is a "special district" can, as the majority suggest, depend on the intent of the Legislature in its formation, given the general rule that the motivation of the Legislature or its members in passing legislation is immaterial to questions involving the validity of legislation. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-700 [170 Cal.Rptr. 817, 621 P.2d 856]; *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 726-728 [119 Cal.Rptr. 631, 532 P.2d 495]; *City of Atascadero* v. *Daly* (1982) 135 Cal.App.3d 466, 471 [185 Cal.Rptr. 228]; 2A Sutherland, Statutory Construction (4th ed. 1984) § 48.17, p. 340.)

The majority opinion acknowledges the rule is uniformly followed in this and other jurisdictions, but immediately thereafter, without any explanation, the opinion declares that the trial court was justified in finding that the Legislature's motive in creating the district at issue here was to avoid the limitaitons of section 4. The opinion makes no attempt to challenge the rule or to distinguish any of the applicable cases—it simply ignores the principle, observing that our main purpose should be to determine whether the electorate intended that section 4 should be easy to circumvent.

Indeed, the majority turn the rule on its head by holding that any local taxing agency formed after the adoption of Proposition 13 *for the purpose of*

*replacing revenue lost by reason of the restrictions of Proposition 13* is a special district, and that in a particular case the evidence may indicate a *lack* of circumventive intent or essential control. This unexplained violation of settled law is especially egregious under the circumstances here. Leaving aside for the moment the effect of the holding on local government, the decision calls for an examination of the Legislature's motives in creating every local taxing agency formed in the 13 years since Proposition 13 was enacted, upon a challenge to the local taxing agency's power to levy a sales tax by majority vote. Such challenges will require the courts to analyze the circumstances leading to the formation of and the powers granted to all these entities, to determine whether the Legislature was attempting to replace revenues lost after Proposition 13. Thus, although the universal rule forbids inquiry into the motives of the Legislature in enacting a statute, the majority's holding compels an examination of such motives in the numerous cases in which a local taxing agency created after Proposition 13 levied a sales tax on the basis of a majority vote.

In this case, the majority attempt to justify this result on the ground of vague "probable intent" of the framers and electorate that approved Proposition 13. But the opinion omits mention of any evidence proffered by the parties to demonstrate the voters' intent and relies, instead, on nothing more than a statement expressed in a rejected dissenting opinion signed by a single justice in *Richmond, supra,* 31 Cal.3d 197, almost a decade ago.

We have much more direct evidence of the intent of the legislative body than that relied on by the majority. Of great significance is an election that occurred two years after *Richmond* was decided. In 1984, the voters refused to adopt Proposition 36, which would have repealed and reenacted section 4 to require that *any* measure which resulted in increasing taxes levied on a taxpayer must be adopted by a two-thirds vote. If the initiative had been successful, it would have overturned our conclusion in *Richmond.* The proponents of the measure stated expressly in the ballot pamphlet that it was designed to close loopholes in the law created by the courts and to require courts to "reverse anti-13 rulings." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 6, 1984) p. 44.) Thus the voters were given the opportunity to enact a provision that would have accomplished what the majority opinion does today, but they rejected the measure. It is disingenuous to hold that nonetheless those voters who enacted Proposition 13 intended that any district formed thereafter can only tax with the approval of a supermajority of the voters.

Even assuming that a court may undertake a wholesale inquiry into the Legislature's motives in creating each of the governmental entities formed

since 1978, the "essential control" test propounded by the majority as the tool to expose circumventive intent is unworkable. Several of the factors noted as establishing circumventive intent actually apply to most California districts. For example, under the test suggested, the fact that there are "common or overlapping governing boards" is viewed as one indication of circumventive intent. Yet of the more than approximately 5,000 nonschool special districts in California, about 40 percent are governed *entirely* by boards consisting of members of boards of supervisors or city councils. (See Cal. Controller, Ann. Rep. of Fin. Transactions Concerning Special Districts of Cal. (1988-1989) p. I-9; *id.* (1977-1978) at p. I-33.) In fact, many statutes require that the governing boards of certain districts consist entirely or partially of the county board of supervisors. (See, e.g., Gov. Code, §§ 53378, 56325, 60162, 61121; Health & Saf. Code, § 40100.) The county board of supervisors is the governing board of most water districts. (See, e.g., 72 West's Wat. Code, Appen., §§ 53-4, 54-4, 55-6, 61-7, 62-6, 63-6.) How circumventive intent can be inferred from such prevailing arrangements, which long antedated Proposition 13, is difficult to comprehend.

Moreover, the fact that the Legislature has created a district with the same boundaries as a county does not, contrary to the majority's holding, indicate that the county controls the district, thereby evidencing an intent to avoid the limitations of Proposition 13. Such arrangements are commonplace; most water districts and counties, for example, have common boundaries. (See e.g., 72 West's Wat. Code, Appen., §§ 53-1, 54-1, 55-2, 61-2, 62-1, 63-2.) Yet this circumstance does not demonstrate that the county controls the district. (See, e.g., *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743, 750-751 [115 Cal.Rptr. 485]; *Riverside etc. Dist. v. Jos. W. Wolfskill Co.* (1957) 147 Cal.App.2d 714, 717-718 [306 P.2d 22].)

Another consideration pointing to circumventive intent, according to the majority, is the "involvement" of the municipality in the formation of the agency. This would frequently be the case, since a major purpose of creating such districts is to respond to local concerns. *Vanoni v. County of Sonoma, supra,* 40 Cal.App.3d 743, 748-751, illustrates the point. There, as is commonly the case, the district and the county had identical boundaries, a common board, citizens, taxable property, and administrative officials, and the district performed functions traditionally undertaken by counties. In other words, the district had most of the characteristics that the majority opinion holds are indicia of county control; yet it was held to be an independent body, not controlled by the county. The majority's contrary holding in the instant case will threaten the taxing powers of many, if not most, California districts formed in the last 13 years.

## III

The majority's conclusion regarding special taxes is, if anything, even more egregious. The construction of the term "special taxes" as used in section 4 to include *all* taxes imposed by a special district not only violates our holding in *Farrell, supra,* 32 Cal.3d 47, 57, but it also disregards the language of section 4 and of Proposition 62, a statutory initiative adopted by the voters in 1986.

Although the majority purport not to abandon the "general governmental purpose test" laid down in *Farrell,* they disregard its distinction between taxes imposed for a general governmental purpose and those levied for a specific purpose. They do this by simply reading the term "special" in the phrase "special taxes" out of section 4 and holding, instead, that every tax levied by a special district is a "special tax." But, as this court has already held, the language of section 4 precludes such a construction. It expressly recognizes that special districts may impose *special taxes.* The majority, by holding that every tax imposed by a special district is a special tax, disregard the word "special" entirely without explanation or justification.

In *Farrell,* we rejected the argument that the term "special" has no meaning in section 4. We first stated the established rule of statutory construction that "an interpretation which would render terms surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning. [Citations.]" (32 Cal.3d at p. 54.)

We went on to discuss the claim of the respondent that the term "special taxes" in section 4 means any taxes imposed by a special district: "We are asked to read the word 'special' out of the phrase 'special taxes,' in violation of settled rules of construction and in the face of the language of section 3 [of article XIII A], which indicates that the drafters knew how to say 'any' taxes when that is what they meant. Our choice here is not simply between acceptance of one of a number of different meanings of an ambiguous term in a statute, but between disregarding the word 'special' altogether in section 4, or affording it some meaning consistent with the intent of the voters in enacting the provision. Application of the rule of strict construction of provisions which require extraordinary majorities for the enactment of legislation is particularly appropriate in these circumstances.

"In keeping with these principles, we construe the term 'special taxes' in section 4 to mean taxes which are levied for a specific purpose rather than, as in the present case, a levy placed in the general fund to be utilized for

general governmental purposes. This is a common meaning of the term, as is evident from the authorities cited above." (*Farrell, supra,* 32 Cal.3d at pp. 56-57.)

The conclusion of the majority not only disregards the holding of *Farrell* and the language of section 4, but flouts the will of the voters, as expressed in two elections held subsequent to *Farrell.* As discussed above, the voters in 1984 rejected Proposition 36, which would have required a two-thirds vote for the imposition of any new taxes by a district. Yet this is precisely the effect of the majority's view that all taxes levied by a special district are special taxes requiring a two-thirds vote.

Equally important, the holding is in plain conflict with the intent of the voters, as expressed by their adoption in 1986 of Proposition 62, a statutory initiative now codified in section 53720 et seq. of the Government Code. Government Code sections 53722 and 53723 recognize that a district may impose either a general tax, which may be passed by a majority vote, or a special tax, which requires a two-thirds vote. These provisions are obviously contrary to the holding of the majority that any tax imposed by a district is a special tax valid only if adopted by a two-thirds vote of the electorate.

Even if some arguable doubt be raised regarding the constitutionality of Proposition 62, it may be considered in interpreting the intent of the voters. As a leading authority on statutory interpretation declares, "Questions having to do with the meaning of a statute are independent of issues concerning its validity. Therefore, even an unconstitutional statute relating to the same subject matter may be considered in order to determine the legislative intent in enacting a statute." (2A Sutherland, Statutory Construction, *supra,* § 51.04, at p. 497.) Here, the voters made it clear by the adoption of Proposition 62 that, contrary to the holding of the majority, a district may impose either a general tax or a special tax, and that only the latter exaction requires a two-thirds vote. Thus, the majority's conclusion that the voters intended that all taxes imposed by a district would require a two-thirds vote is demonstrably incorrect.

IV

It is difficult to exaggerate the profound and unsettling consequences that the majority's holding threatens to produce. During the almost 10 years since *Richmond, supra,* 31 Cal.3d 197, and *Farrell, supra,* 32 Cal.3d 47, were decided, the Legislature, local entities, bondholders, taxpayers, contractors, and others have relied on the holdings of those prevailing cases to enter into contracts, issue and purchase bonds, and adopt sales tax measures. These

transactions appear to now be at risk as to all local agencies created after 1978—a considerable number, admittedly, according to the majority opinion. Many billions of dollars have been committed and spent on the premise that *Richmond* and *Farrell* were the controlling law. Not only does the majority's decision endanger innumerable transactions, but in addition, local entities which may be prevented from collecting sales taxes because of the majority's holding will lose billions of dollars in matching funds from the state and federal governments.

Although the majority question whether their decision will "necessarily jeopardize all taxing agencies created since 1978," since they do not declare their holding applies only prospectively, it will obviously threaten the ability of some, and perhaps most of them, to collect or continue to collect the taxes necessary to meet their obligations and to remain solvent. The extent of such jeopardy cannot be known, but it is safe to say that the financial stability of all districts created since 1978 will be severely damaged by the prospect that the validity of sales taxes adopted by less than a supermajority vote can be challenged on the basis of legislative motivation in forming the district. There is no doubt that the majority holding poses a major threat to the very existence of numerous local taxing entities that carry out essential government functions.

To illustrate: according to amicus curiae Orange County Local Transportation Authority, over the past 15 years more than 20 such transportation authorities have been established, most of them since 1978. Sixteen of these authorities have obtained voter approval for imposition of sales taxes to fund transportation projects. During the 1991-1995 period alone, nearly $6 billion is projected to be raised by these taxes, with billions more in later years. More than $1.5 billion in tax bonds backed by sales tax receipts are currently outstanding. The Orange County agency has raised nearly $50 million from the sale of limited tax bonds and has begun to implement plans to spend $3.1 billion in sales tax revenues to build necessary freeways and transit systems. Forty percent of this revenue will fund improvements to state and interstate highway systems. The availability of sales tax revenues has enabled the transportation authority to qualify for $59 million in additional state matching funds for transportation projects in the 1990-1991 fiscal year alone.

To cast doubt on the validity of the sales taxes needed to fund these and similar improvements is likely to cause chaos in the financial markets because the hundreds of millions of dollars in bonds issued by agencies would be rendered worthless if the underlying sales tax is held to be invalid. The ripple effect cannot be exaggerated, since the bonds have been purchased as an investment by countless individuals, corporations, bond funds,

government and private retirement funds, banks and insurance companies. They will be the ultimate losers.

It should be noted that the foregoing projections are limited to only one type of local agency. If the effect on the operations of numerous other types of local agencies created after 1978 is taken into account, the destructive effects of the majority's holding would be multiplied manyfold.

If ever a case justified application of the doctrine of stare decisis, this is it. Our frequent reiteration of this principle would amount to a hollow pronouncement indeed if we fail to follow it under the circumstances of this case. As recently as last year, we pledged our adherence to the doctrine when we stated that "more than in any other situation, courts are inclined to follow precedent when property rights have been founded and vested in accord with an existing rule." (*Security Pacific National Bank* v. *Wozab* (1990) 51 Cal.3d 991, 1000 [275 Cal.Rptr. 201, 800 P.2d 557].) The majority, by effectively overruling *Richmond* and *Farrell*, threaten the value of billions of dollars in obligations entered into in reliance on those decisions.

V.

Although I am reluctant to offer suggestions to the majority, because their opinion represents a radical volte-face in our jurisprudence at the very least they should have rendered their unprecedented holding prospective only. Their deliberate avoidance of this crucial issue is ominous.

A court may refuse to give retroactive effect to a decision when considerations of fairness or public policy justify prospective operation. (*Forster Shipbldg. Co.* v. *County of L. A.* (1960) 54 Cal.2d 450, 459 [6 Cal.Rptr. 24, 353 P.2d 736].) We recognize that when we overrule our earlier authority, considerations of fairness may require prospective application of our new holding, particularly when contracts have been made or property rights acquired in accordance with the prior decision. (See *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58]; *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 151-152 [181 Cal.Rptr. 784, 642 P.2d 1305]; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 681 [312 P.2d 680].)[1] We recently applied this doctrine when a retroactive application of our decision would have been unfair to the many

---

[1]We recognize that there is turmoil in the high court on this point. In *James B. Beam Distilling Co.* v. *Georgia* (1991) 501 U.S. __ [115 L.Ed.2d 481, 111 S.Ct. 2439] Justice Souter, joined by Justice Stevens, expressed the view that equal treatment of litigants and stare decisis demanded that if a new rule is applied to the prevailing party, it must be applied retroactively to all other litigants. Justice White agreed, but opined that in some cases a new rule could be held fully prospective. Justice Blackmun, joined by Justices Marshall and Scalia, was of the

plaintiffs who had instituted lawsuits on the basis of the earlier authority. (*Moradi-Shalal* v. *Fireman's Fund. Ins. Companies, supra,* 46 Cal.3d at p. 305.)

It appears that in the case before us, the proceeds of the challenged tax have been set aside pending the determination of this cause. There is no claim that contracts or other obligations have been entered into in reliance on the validity of the tax. Under these circumstances, it is not inappropriate to apply the majority decision to this case. But in many other instances, as pointed out above, the validity of billions of dollars in obligations may be threatened by the new rule adopted today. At stake is not only the interest of private litigants, or even private investors, but the stability of public finance at the local level.

In *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 193 [98 Cal.Rptr. 837, 491 P.2d 421], we held that whether fairness and public policy warranted prospective application of a decision turned primarily on the extent of public reliance on the former rule, and upon the ability of litigants to foresee the coming change in the law. (See also *Estate of Propst* (1990) 50 Cal.3d 448, 463 [268 Cal.Rptr. 114, 788 P.2d 628].) Local government entities and the parties with whom they dealt were fully justified in relying on our definition of a "special district" in *Richmond* and "special taxes" in *Farrell.* The suggestion to the contrary, based on a comment in *Richmond,* is unwarranted. At the end of our *Richmond* opinion, in response to the fear expressed in the lone dissent (that "wholesale avoidance" of the supermajority requirement of section 4 would result if new districts were created without the power to impose a property tax), we stated that this "problem can be dealt with if and when the issue arises." (*Richmond, supra,* 31 Cal.3d at p. 208.)

This chance comment cannot be seized upon to render the wholesale reliance on our holding by local taxing agencies to be unreasonable. In view of the well-established rule that the courts will not inquire into the motivations of the Legislature in enacting statutes, the remark could not reasonably have been interpreted by local taxing authorities as a warning that in the

view that a prospective opinion is inconsistent with the court's obligation to decide only cases and controversies. Justice Scalia, joined by Justices Marshall and Blackmun, expressed the view that the court lacked the authority to make any opinion prospective, because judges decide what the law *is,* "rather than decreeing what it is today *changed* to, or what it will *tomorrow* be." (*Id.,* at p. __ [115 L.Ed.2d at p. 497.]) Justice O'Connor dissented, joined by Chief Justice Rehnquist and Justice Kennedy, arguing that the court had frequently refused to apply new rules retroactively in civil cases, in order to avoid unfair disruption of settled expectations.

As our case does not involve any question of federal law, we are not under any obligation to follow the high court's tortuous path. (*James B. Beam Distilling Co.* v. *Georgia, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 488]; *American Trucking Assns.* v. *Smith* (1990) 496 U.S. 167, 177-178 [110 L.Ed.2d 148, 159, 110 S.Ct. 2323].)

distant future this court would authorize an inquiry into the Legislature's motive in creating each local taxing authority since Proposition 13 was enacted, upon a challenge to a sales tax. Any concerns that our decisions would allow the supermajority requirement of section 4 to be evaded could have been addressed by the voters, but, as we have seen, on two separate occasions they indicated their agreement with our holdings in *Richmond* and *Farrell.*

## VI.

The concluding paragraph of the concurring opinion injects a particularly disturbing note. It reveals a callous indifference for the consequences of an opinion of this court—even when the opinion disregards stare decisis; overrules two prior opinions of this court that have guided the bench, bar and public for nearly a decade; and when the consequences are likely to produce a devastating effect on the economy, potentially the existence of numerous public agencies and the well-being of countless individual and corporate investors who relied on our prior decisions. We cannot in good conscience attribute the untoward consequences of this court's decision to other persons' actions. The buck stops here.

## VII.

The majority opinion cannot withstand analysis under law or case precedent and is likely to wreak untold financial havoc on countless local entities. It should be rejected.

KENNARD, J.—I dissent. I agree with Justice Mosk that the local agency here is not a special district subject to the provisions of section 4 of article XIII A of the California Constitution and that the majority's interpretation of the phrase "special taxes" is overbroad. Because the majority has elected to "leave open the question of a possible prospective application" of its holding (maj. opn., *ante,* at p. 13), I express no view on that issue.

Respondents' petitions for a rehearing were denied February 13, 1992, and the opinion was modified to read as printed above. Mosk, J., and Kennard, J., were of the opinion that the petitions should be granted.