Filed 10/3/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALLIANCE SAN DIEGO et al., Plaintiffs and Respondents, v. CALIFORNIA TAXPAYERS ACTION NETWORK et al., Defendants and Appellants; YES! FOR A BETTER SAN DIEGO et al., Defendants and Respondents. | D084969 (Super. Ct. Nos. 37-2021-00024590-CU-MC-CTL & 37-2021-00024607-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Wendy M. Behan, Judge.  Affirmed.

Briggs Law Corporation, Janna M. Ferraro and Cory J. Briggs for Defendants and Appellants California Taxpayers Action Network, Donna Frye, and Project for Open Government.

No appearance for Plaintiffs and Respondents Alliance San Diego, Isidro D. Ortiz, and Michael McConnell.

No appearance for Plaintiff and Respondent City of San Diego.

Colantuono, Higsmith & Whatley, Michael G. Colantuono, Matthew C. Slentz, and Adam N. Mentzer for Defendant and Respondent Yes! For a Better San Diego.

No appearance for Defendant and Respondent Howard Jarvis Taxpayers Association.

## INTRODUCTION

The City of San Diego (the City) placed a citizens' initiative, Measure C, on the ballot for the March 2020 general and special election. As we noted in *Alliance San Diego v. City of San Diego* (2023) 94 Cal.App.5th 419 (*Alliance San Diego*), the previous appeal in this case, Measure C received 65.24 percent of the votes cast. In April 2021, the city council adopted a resolution declaring Measure C had passed and additional resolutions authorizing the issuance of bonds based on Measure C's provisions.

Alliance San Diego (Alliance) filed a petition for writ of mandate and a reverse validation complaint, seeking a determination that the City's resolution declaring Measure C had passed was invalid. The City then filed a validation complaint, seeking determinations that its resolution declaring Measure C had passed and its related bond resolutions were valid. California Taxpayers Action Network, Project for Open Government, and Donna Frye (collectively, CTAN) and various other entities and individuals (collectively, the opponents) filed answers to the City's validation complaint. One of the opponents, the Howard Jarvis Taxpayers Association (HJTA), filed a motion for judgment on the pleadings. Concluding that Measure C required a two-thirds vote to pass, the trial court granted the motion and entered a judgment against the City.

2

On appeal from that judgment, in *Alliance San Diego*, we assumed that Measure C is a citizens' initiative, which requires only a simple majority vote to pass, and concluded that the trial court erred by granting the motion for judgment on the pleadings. (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 425.) However, because the record on appeal was not sufficiently developed for us to determine whether Measure C is a bona fide citizens' initiative, we reversed the judgment and remanded the matter for further proceedings. (*Id*. at pp. 426, 448–449.)

On remand, the trial court granted the motion filed by the City and Yes! For a Better San Diego (Yes Committee) to quash deposition subpoenas served by CTAN on certain individuals who had supported Measure C.[1] CTAN thereafter did not attempt to obtain any further discovery. Based on the City's administrative record, the trial court then conducted a bench trial on the merits of the City's validation complaint and Alliance's reverse validation complaint. At trial, CTAN argued that: (1) the trial court lacked subject matter jurisdiction because Government Code section 53511 does not authorize validation actions for either a citizens' initiative or special taxes imposed by a citizens' initiative; (2) the case was not ripe for validation because specific bonds have not yet been issued; (3) the California Constitution and the San Diego City Charter require a two-thirds vote of the electorate to approve the issuance of the Measure C bonds; and (4) Measure C is not a bona fide citizens' initiative and is instead a City-sponsored measure which requires a two-thirds vote of the electorate and review under the California Environmental Quality Act (CEQA). The trial court rejected all of CTAN's arguments and entered a validation judgment for the City.

---

[1]     The other opponents to the City's validation action did not actively participate in the proceedings after remand of the matter.

3

On appeal, CTAN restates the arguments that it made at trial, as described *ante*.  In addition, CTAN argues that the trial court erred by excluding certain hearsay evidence regarding statements made by supporters of Measure C.  As explained *post*, we conclude that the trial court correctly rejected CTAN's arguments and excluded its hearsay evidence.  Therefore, we affirm the validation judgment.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Measure C, "Hotel Visitor Tax Increase for Convention Center Expansion, Homelessness Programs and Street Repairs," having received sufficient valid signatures of registered city voters to qualify as a citizens' initiative, was placed on the ballot for the March 3, 2020 municipal primary election and municipal special election.  Measure C was promoted by a coalition of homeless rights advocates, civic and community activists, labor unions, and businesses.  As we explained in *Alliance San Diego*, Measure C, if passed, would add a new provision, section 35.0201, subdivision (a) to the San Diego Municipal Code, increasing the city's transient occupancy tax applied to overnight facilities by either 1.25, 2.25, or 3.25 percent, depending on the proximity of the facilities to the general vicinity of downtown San Diego.  The additional tax revenues raised by Measure C would be used only for certain special purpose activities (i.e., homelessness programs, street repairs, and convention center improvements, operations, support activities, and business development programs).  Measure C would also authorize the City to issue and sell bonds, to be repaid from the applicable allocated portion of those additional tax revenues.

---

[2]     For additional factual and procedural background, refer to our opinion in *Alliance San Diego, supra*, 94 Cal.App.5th 419.

4

Following the March 3, 2020 election, the city clerk certified the results, stating that 239,024 electors, or 65.24 percent, voted for Measure C, and 127,349, or 34.76 percent, voted against Measure C. On April 6, 2021, the city council passed resolution R-313485, declaring that Measure C was approved in the March 3, 2020 election. On that date, the city council also passed two resolutions related to Measure C, i.e., resolution R-313486, which authorized and approved the issuance and sale of homelessness program bonds, and resolution R-313487, which authorized and approved the issuance and sale of convention center modernization bonds.

On June 3, 2021, Alliance (joined by individual plaintiffs Isidro D. Ortiz, Alliance's board chair, and Michael W. McConnell) filed a petition for writ of mandate and reverse validation complaint against the City, challenging the validity of resolution R-313485, which declared Measure C had been approved, and all related actions subsequently taken by the City as a result, including resolutions R-313486 and R-313487. The City filed an answer to the writ petition and reverse validation complaint.

On June 4, the City filed a validation complaint, seeking determinations that its resolutions declaring that Measure C had passed and authorizing and approving the Measure C bonds (as set forth in resolutions R-313486 and R-313487) were valid. Answers to its validation complaint were filed by CTAN, HJTA, Alliance, and the Yes Committee. The first three answers asked the court to invalidate Measure C, while the Yes Committee's answer supported the City's complaint. The trial court consolidated the validation and reverse validation actions.

HJTA and Alliance filed a motion for judgment on the pleadings, arguing that the City improperly applied a simple majority vote requirement for approval of Measure C. CTAN joined in the motion. The trial court

5

granted the motion, concluding that the City's ordinance placing Measure C on the ballot stated that a two-thirds vote was required for its passage and that the City could not thereafter reduce the required threshold to a simple majority. On May 2, 2022, the court entered judgment against the City, invalidating resolution R-313485 and directing the City to refrain from implementing or enforcing Measure C or any resolutions dependent on its passage.

On appeal, the City and the Yes Committee argued that Measure C was a citizens' initiative and therefore required only a simple majority vote for passage, despite the City's ordinance stating otherwise. (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 425.) In *Alliance San Diego*, we assumed, as did the trial court, that Measure C is a citizens' initiative. (*Ibid.*) We then concluded, among other things, that Measure C was subject to a simple majority vote and therefore the trial court erred by granting the motion for judgment on the pleadings. (*Ibid.*) Because our conclusion was based on the assumption that Measure C is a citizens' initiative and we found that the record was "not sufficiently developed to consider the challenge to that assumption raised by affirmative defense in [CTAN's] answer to the City's validation complaint," we reversed the judgment and remanded the matter for further proceedings. (*Id.* at p. 426.) In so doing, we directed the trial court to consider the issue of whether the City retained substantial control over the initiative process or otherwise acted in a way that shows Measure C is not a bona fide citizens' initiative. (*Id.* at p. 448.)

On remand, the trial court granted the motion filed by the City and the Yes Committee to quash deposition subpoenas served by CTAN on Jaymie Bradford and Carol Kim. After the parties submitted their trial briefs, the court excluded certain hearsay evidence offered by CTAN and

conducted a bench trial on the administrative record.  On August 30, 2024, the trial court issued a minute order rejecting each of CTAN's arguments and finding in favor of the City and the Yes Committee.  Also on August 30, the court entered a judgment in favor of the City, validating Measure C and resolutions R-313485, R-313486, and R-313487.

CTAN timely filed a notice of appeal challenging the judgment.  CTAN filed an appellant's opening brief and reply brief and the Yes Committee filed a respondent's brief.  Although the City participated in the trial on its validation action, it has not filed a respondent's brief in the instant appeal.

DISCUSSION

I

*Trial Court Had Subject Matter Jurisdiction*

CTAN contends that the judgment must be reversed because the trial court lacked subject matter jurisdiction over the City's validation action.  In particular, it argues that Government Code section 53511, subdivision (a) (section 53511(a)), which the City cited as authority for its validation action, is not a law under Code of Civil Procedure section 860 that authorizes an action to validate a citizens' initiative or special taxes imposed by a citizens' initiative.  We disagree.

A

"The principle of 'subject matter jurisdiction' relates to the inherent authority of the court involved to deal with the case or matter before it." (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1087.)  Subject matter jurisdiction is conferred by law (i.e., by the California Constitution or statute).  (*People v. Hampton* (2019) 41 Cal.App.5th 840, 846.)  "[I]n the absence of subject matter jurisdiction, a trial court has no power 'to hear or determine [the] case.' "  (*Varian Medical Systems, Inc. v. Delfino* (2005)

7

35 Cal.4th 180, 196.) "[A]ny judgment or order rendered by a court lacking subject matter jurisdiction is 'void on its face . . . .' " (*Ibid.*) On appeal, the question of whether a trial court had subject matter jurisdiction over a controversy is a question of law, which we review de novo. (*Robbins v. Foothill Nissan* (1994) 22 Cal.App.4th 1769, 1774.) Likewise, "[m]atters of statutory interpretation are also subject to de novo review." (*San Diegans for Open Government v. City of San Diego* (2015) 242 Cal.App.4th 416, 427 (*San Diegans for Open Government*).)

"There is subject matter jurisdiction to entertain a validation proceeding only if there is a statutory basis for that jurisdiction . . . ." (*Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1101.) Code of Civil Procedure section 860 provides: "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter . . . bring an action in the superior court . . . to determine the validity of such matter. The action shall be in the nature of a proceeding in rem." Code of Civil Procedure section 864 provides:

> "For purposes of this chapter, *bonds*, warrants, contracts, obligations, and evidences of indebtedness *shall be deemed to be in existence upon their authorization*. Bonds and warrants shall be deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance authorizing their issuance . . . ." (Italics added.)

The above validation statutes do not set forth the specific matters that are subject to validation actions, but instead rely on other statutes for such authorization. (*Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 31 ["[W]e look to other statutes to determine the scope of public agency actions that are subject to validation under the validation statutes."].) Therefore, as one court

noted, "[d]etermining whether the validation statutes apply to a particular agency action is an exercise in cross-referencing." (*Coachella Valley Water Dist. v. Superior Court* (2021) 61 Cal.App.5th 755, 768.)

B

In its complaint, the City alleged that it was authorized to bring, and the trial court had subject matter jurisdiction over, its validation action pursuant to Code of Civil Procedure section 860 and Government Code section 53511. In its answer to the complaint, CTAN alleged, among other things, that the trial court did not have subject matter jurisdiction over the City's validation action. In its August 30, 2024 minute order, the trial court rejected CTAN's argument that it did not have subject matter jurisdiction under section 53511(a) because there were no specific bonds ready to be issued pursuant to Measure C or its related resolutions. The court noted that section 53511(a) authorizes a local agency to " 'bring an action to determine the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness . . . .' " Citing *Davis v. Fresno Unified School Dist.* (2023) 14 Cal.5th 671, 691 (*Davis*), the court found that the Measure C bonds "exist[ed]" pursuant to Code of Civil Procedure section 860 when the city council passed resolutions R-313486 and R-313487 authorizing the issuance of bonds pursuant to Measure C and that those resolutions were necessary first steps "inextricably bound up" with the ultimate issuance of those bonds. In its judgment, the court declared that the City's validation action was properly brought under California Code of Civil Procedure sections 860 et seq. and that it "had jurisdiction over all persons and the subject matter of this action."

C

On appeal, CTAN again argues that the trial court lacked subject matter jurisdiction over the City's validation action. We, as the trial court did below, reject that argument and conclude that the trial court had subject matter jurisdiction over the City's validation action.

Section 53511(a) provides: "A local agency may bring an action to determinate the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure." Contrary to CTAN's assertion, resolutions R-313486 and R-313487 authorized the issuance of bonds pursuant to Measure C. Resolution R-313486 states in part:

> "2. Consistent with the intent of the voters in approving Measure C, the Council *authorizes and approves the issuance and sale* of the Homelessness Program Bonds with maximum bonded indebtedness, including financing costs, in an amount not to exceed [$750 million] . . . .

> "3. The Chief Financial Officer is authorized and directed to coordinate the preparation of bond indenture and related documents, for the Council's future approval, governing the issuance and sale of the Homelessness Program Bonds on terms and conditions consistent with this Resolution."
> (Italics added.)

Resolution R-313487 included identical language "*authoriz*[*ing*] *and approv*[*ing*] *the issuance and sale* of the Convention Center Modernization Bonds with maximum bonded indebtedness, including financing costs, in an amount not to exceed [$200 million] . . . ." (Italics added.) Accordingly, both resolutions expressly state that the city council "authorizes and approves the issuance and sale of" bonds for the homelessness program and convention

10

center modernization pursuant to Measure C.  Furthermore, both resolutions "authorize[ ] and direct[ ]" the City's chief financial officer to coordinate the preparation of bond indenture and related documents for the city council's future approval of the issuance and sale of the homelessness program and convention center modernization bonds consistent with those resolutions.

Although CTAN correctly notes that neither resolution R-313486 nor resolution R-313487 authorized or approved the issuance and sale of any *specific* bonds, we conclude that the trial court nevertheless had subject matter jurisdiction over the City's validation action because those resolutions authorized and approved the preliminary steps necessary for, and therefore were inextricably bound up with, the ultimate issuance of specific bonds.  In *Davis*, our Supreme Court stated:  "In our view, a local agency contract [is subject to a validation action under section 53511] if it is *inextricably bound up with* government indebtedness or with debt financing guaranteed by the agency.  To satisfy this standard, the contract must be one on which the debt financing of the project directly depends." (*Davis, supra*, 14 Cal.5th at p. 691, italics added.)  *Davis* noted several appellate courts had applied the "inextricably bound up with" standard in concluding validation actions were authorized for various contracts that were precursors to, or preliminary steps toward, government indebtedness (e.g., local agency's loan guarantee which was necessary to allow public benefit corporation to obtain project financing, local agency contract to generate funds to repay government debt, and contract for construction of garage financed with bonds to be paid from tax increment generated by retail center for which garage was essential component). (*Id.* at p. 690.)

Here, we conclude that by "authoriz[ing] and approv[ing] the issuance and sale of" bonds for Measure C's homelessness program and convention

11

center modernization, resolutions R-313486 and R-313487 are "inextricably bound up with" government indebtedness for purposes of section 53511(a). (*Davis, supra*, 14 Cal.5th at p. 691.) We also conclude that "the debt financing of the [program or] project directly depends" on those preliminary authorizations and approvals of issuance of bonds for that program and project. (*Ibid*.) Furthermore, we conclude that the bonds authorized and approved by resolutions R-313486 and R-313487 "exist[ed]" within the meaning of Code of Civil Procedure section 860 because bonds "shall be deemed to be in existence upon their authorization" and issuance of the Measure C bonds was authorized as of the date of those resolutions. (Code Civ. Proc., § 864.) Therefore, we reject CTAN's assertion that validation actions are authorized under section 53511(a) only for issuance of actual, existing bonds or other binding evidence of indebtedness and not for preliminary, or prerequisite, authorizations or other actions necessary for the future issuance of bonds.[3] We conclude that CTAN has not carried its burden on appeal to show that section 53511(a) did not apply to authorize the City's validation action and, in particular, that *Davis*'s test for section 53511(a) validation actions does not apply to the instant circumstances.[4] Accordingly, we conclude that the trial court correctly found

---

[3] For example, both resolutions authorized and directed the City's chief financial officer to coordinate the preparation of bond indenture and related documents for future approval by the city council, which actions were preliminary steps necessary for the ultimate issuance of the bonds pursuant to Measure C and resolutions R-313486 and R-313487 and therefore were "inextricably bound up with" the future issuance of specific Measure C bonds. (*Davis, supra*, 14 Cal.5th at p. 691.)

[4] Importantly, we note that CTAN's opening brief and reply brief omit any discussion of *Davis*'s "inextricably bound up with" test for validation actions authorized by section 53511(a) and its application to the City's

12

that section 53511(a) specifically authorized the City's validation action and that it had subject matter jurisdiction over the action pursuant to Code of Civil Procedure section 860 and section 53511(a).[5]

## II

### *The City's Validation Action Was Ripe for Adjudication*

CTAN contends that the trial court also erred by finding the City's validation action was ripe for validation. CTAN argues, as it did at trial, that the City's validation action was not ripe for adjudication because the City had not yet authorized the issuance of any existing bonds. We disagree.

### A

Ripeness is a doctrine that applies to prevent courts from issuing purely advisory opinions or resolving abstract differences of opinion. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 (*Pacific Legal Foundation*).) The ripeness doctrine primarily reflects the principle that "judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Ibid.*)

"In determining whether a controversy is ripe, we use a two-pronged test: (1) whether the dispute is sufficiently concrete to make declaratory relief appropriate; and (2) whether the withholding of judicial consideration

---

validation action. (*Davis, supra*, 14 Cal.5th at p. 691.) Also, we reject CTAN's assertion that resolutions R-313486 and R-313487 were "merely" declarations of official intent pursuant to United States Treasury Regulations. As discussed *ante*, those resolutions expressly authorized and approved the issuance and sale of bonds pursuant to Measure C.

[5] By so concluding, we need not, and do not, address the Yes Committee's argument that CTAN is estopped from challenging the trial court's subject matter jurisdiction because it did not raise that issue at trial.

will result in a hardship to the parties. [Citation.] Under the first prong, the courts will decline to adjudicate a dispute if 'the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues' [citation], if the court is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a 'contrived inquiry' [citation]. Under the second prong, the courts will not intervene merely to settle a difference of opinion; there must be an imminent and significant hardship inherent in further delay.' [Citation.]" (*Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 502 (*Farm Sanctuary, Inc.*).)

B

We conclude, as the trial court did in its minute order, that the first prong for ripeness of the City's validation action was satisfied. Specifically, we conclude that the controversy regarding the validity of Measure C and the City's authority to incur debt against Measure C's tax proceeds was "sufficiently concrete" for the trial court to adjudicate the merits of the City's validation action. (*Farm Sanctuary, Inc., supra*, 63 Cal.App.4th at p. 502.) Given the results of the March 2020 election and the city council's passage of resolutions R-313486 and R-313487, there was nothing "abstract" about the issues raised in the City's validation action that would make it difficult for the trial court to evaluate and decide those issues, nor was the court asked to speculate on the resolution of hypothetical situations. (*Ibid*.) Contrary to CTAN's assertion, the absence of authorization and/or approval of existing bonds did *not* reduce the City's validation action to a mere request that the trial court adjudicate a hypothetical situation.[6] As discussed *ante*, the

---

[6] CTAN cites as an example of existing bonds a general obligation bond measure proposed by the City which was placed on the November 2020 ballot (i.e., Measure A). However, that measure was subject to different requirements (e.g., a two-thirds vote of the electorate pursuant to

14

Measure C bonds authorized and approved by resolutions R-313486 and R-313487 "exist[ed]" within the meaning of Code of Civil Procedure section 860 because bonds "shall be deemed to be in existence upon their authorization." (Code Civ. Proc., § 864.) Accordingly, the City's action asked the trial court to adjudicate the validity of an existing set of concrete facts such that its "issues [were] framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation, supra*, 33 Cal.3d at p. 170.)

We also conclude, as did the trial court, that the second prong for ripeness of the City's validation action was satisfied. If the trial court had refrained from adjudicating the City's action, the City would have suffered a hardship. (*Farm Sanctuary, Inc., supra*, 63 Cal.App.4th at p. 502.) Measure C's programs and projects depended on bond revenues to be repaid by the special taxes imposed by Measure C. If the trial court had not adjudicated the City's validation action, the City may not have been able to proceed toward issuance of bonds for those programs and projects or their issuance at reasonable interest rates because the " 'possibility of future litigation [would] very likely [have had] a chilling effect upon potential third party lenders, thus resulting in higher interest rates or even the total denial of credit . . . .' [Citation.]" (*McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1168.) Contrary to CTAN's assertion, the City's action did *not* ask the trial court "merely to settle a difference of opinion; there [was] an imminent and significant hardship inherent in further delay. [Citation.]"

---

Government Code, § 43610 et seq.) and therefore does not show the City's instant validation action did not involve an existing set of concrete facts or was otherwise not ripe for adjudication. Furthermore, to the extent CTAN asserts that Measure C and/or resolutions R-313486 and R-313487 were required to comply with Government Code section 43610 et seq., we reject that conclusory assertion.

(*Farm Sanctuary, Inc.,* at p. 502.)  CTAN therefore has not carried its burden on appeal to show the City would not suffer hardship if its validation action were not adjudicated by the trial court.  Accordingly, we conclude that the trial court correctly found that the City's validation action was ripe for adjudication.

III

*The Special Fund Doctrine Applied to Exempt Measure C's Related Bond Resolutions from the Two-Thirds Vote Requirement for General Obligation Bonds*

CTAN contends that the trial court erred by finding that resolutions R-313486 and R-313487, which authorized and approved the issuance and sale of Measure C bonds, were not subject to the two-thirds vote requirements of the California Constitution and the San Diego City Charter. In particular, it argues the special fund doctrine does not apply in the circumstances of this case.

A

California Constitution, article XVI, section 18 provides: "No . . . city . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose. . . ."  The San Diego City Charter, section 99 sets forth a similar two-thirds vote requirement to issue bonds or incur other indebtedness, but excepts from that vote requirement certain indebtedness for which the interest is paid from an annual tax sufficient to pay that interest when due and for which there is a sinking fund to pay its principal, stating:

> "The City shall not incur any indebtedness . . . exceeding in any year the income and revenue provided for such year unless the qualified electors of the City, voting at an

16

election to be held for that purpose, have indicated their assent as then required by the Constitution of the State of California, nor *unless* before or at the time of incurring such indebtedness *provision shall be made for the collection of an annual tax sufficient to pay the interest* on such indebtedness as it falls due, *and also provision to constitute a sinking fund for the payment of the principal thereof*, on or before maturity, which shall not exceed forty years from the time of contracting the same . . . ." (Italics added.)

California Constitution, article XVI, section 18 "was intended to prevent municipalities from incurring debts and liabilities exceeding their revenue, a practice that had created heavy burdens on future municipal revenues." (*Barkley v. City of Blue Lake* (1996) 47 Cal.App.4th 309, 313.) The purpose of that constitutional provision "is to safeguard the general funds and property of a public entity by preventing bondholders from forcing an increase in the taxes of, or foreclosing on the general assets and property of, the issuing entity to obtain payment." (*City of Bakersfield v. West Park Home Owners Assn. & Friends* (2016) 4 Cal.App.5th 1199, 1205 (*City of Bakersfield*).)

However, the California Supreme Court has recognized a number of exceptions to that constitutional debt limit. (*Law Offices of Cary S. Lapidus v. City of Wasco* (2004) 114 Cal.App.4th 1361, 1367.) In particular, the court has adopted the special fund doctrine, holding that article XVI, section 18 of the California Constitution "is not violated by revenue bonds or other *obligations* which are *payable solely from a special fund, provided the governmental body is not liable to maintain the special fund out of its general funds, or by tax levies, should the special fund prove insufficient*." (*City of Oxnard v. Dale* (1955) 45 Cal.2d 729, 733 (*City of Oxnard*), italics added.) "[S]uch an obligation is not considered to be an indebtedness or liability of the

17

political subdivision or agency issuing the bonds, within the meaning of the constitutional limitation." (*Ibid.*)

## B

CTAN argues, as it did at trial, that Measure C and resolutions R-313486 and R-313487 authorize and approve *general* obligation bonds that *obligate the City* to make payments on those bonds and therefore they are not exempt from the constitutional two-thirds vote requirement under the special fund doctrine. In support of its assertion that Measure C and those resolutions obligate the City to make payments on the bonds, CTAN quotes language from proposed San Diego Municipal Code section 35.0210(g) (section 35.0210(g)) which would be added by Measure C, as follows:

> "All of the Bonds authorized to be issued pursuant to this Section shall be limited obligations of the City payable solely from the Additional Tax Revenues attributable to the pertinent Additional Tax Component. *Notwithstanding the foregoing, the City may, but is not obligated to, supplement Additional Tax Revenues with other legally available funds to make payments on the Bonds.* The issuance of Bonds pursuant to this Section shall not directly, indirectly, or contingently obligate the City to levy or pledge any form of taxation other than the Additional Tax." (Italics added.)

CTAN argues that the Measure C language italicized *ante* would obligate the City to make payments on the Measure C bonds out of its general funds and therefore authorization and approval of those general obligation bonds would require a two-thirds vote of the electorate. Specifically, CTAN asserts that the use of the word "*may*" in proposed section 35.0210(g) would *obligate* the City to pay any shortfall in Measure C bond payments from its general funds or sources other than the special tax funds established by Measure C.

As discussed *ante*, matters of statutory interpretation are subject to our de novo, or independent, review. (*San Diegans for Open Government, supra,*

242 Cal.App.4th at p. 427.) We likewise independently review local agency ordinances, municipal codes, and written documents that do not involve conflicting extrinsic evidence. (*Meyers v. Board of Administration etc.* (2014) 224 Cal.App.4th 250, 256; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866.) "The rules of statutory construction applicable to statutes are also applicable to municipal ordinances." (*Lateef v. City of Madera* (2020) 45 Cal.App.5th 245, 253.) In interpreting statutory language, we first look to the plain meaning of the statutory language, then to its legislative history, and finally to the reasonableness of the proposed construction of the statutory language. (*Ibid*.) Where the language of a statute is clear, its plain meaning should be followed. (*Ibid*.) "We do not consider statutory language in isolation; instead, we examine the entire statute to construe the words in context." (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 972 (*Kirzhner*).)

Based on our independent review of proposed section 35.0210(g) and resolutions R-313486 and R-313487, we conclude that their plain language cannot reasonably be interpreted as obligating the City to make payments on the Measure C bonds out of its general funds or any funds other than the special tax funds established by Measure C. First, the italicized language *ante* from proposed section 35.0210(g) cannot be read in isolation from, but instead must be read together with, the sentence preceding it and the sentence succeeding it. (*Kirzhner, supra*, 9 Cal.5th at p. 972.) As discussed *ante*, the first sentence of proposed section 35.0210(g) provides: "All of the Bonds authorized to be issued pursuant to this Section shall be *limited obligations* of the City *payable solely from the Additional Tax Revenues* attributable to the pertinent Additional Tax Component." (Italics added.) That language could not be more clear that the Measure C bonds would be

"limited," and *not* general, obligations of the City and that payments on those bonds would be made "solely" from the Measure C special taxes.

Likewise, the third sentence of proposed section 35.0210(g) provides: "The issuance of Bonds pursuant to this Section *shall not directly, indirectly, or contingently obligate the City to levy or pledge any form of taxation other than the Additional Tax.*" (Italics added.) By stating that the Measure C bonds "*shall not* directly, indirectly, or contingently *obligate*" the City to make payments on those bonds other than from the Measure C special tax funds, the third sentence could not be more clear that the Measure C bonds were *not* general obligations of the City. (Italics added.) Therefore, in interpreting the second sentence of proposed section 35.0210(g) in the context of the two sentences preceding and succeeding that sentence, we conclude that the word "may" as used in that sentence, which would allow the City to make supplemental payments on the Measure C bonds from legally available funds other than the Measure C special tax funds, *cannot* reasonably be interpreted as *obligating* the City to make payments from its general funds or funds other than the Measure C special tax funds.[7]

CTAN notes that resolutions R-313486 and R-313487 omit the language in the second sentence of proposed section 35.0210(g) and suggests that omission supports its argument that the Measure C bonds would be general obligation bonds. On the contrary, we conclude the omission of that language supports, rather than detracts, from our conclusion that the

_____

[7]     CTAN's reference to the City's definition of general obligation bonds does not help its argument that the Measure C bonds would be general obligation bonds. That definition requires general obligation bonds to be secured by a promise to levy taxes in an unlimited amount as necessary to pay the debt service. Because the Measure C bonds do not include any such promise or security other than the Measure C special tax funds, they are not general obligation bonds even under the City's own definition.

Measure C bonds would not be general obligation bonds of the City. Those resolutions provide, among other things, that the homelessness program bonds and the convention center modernization bonds "shall be valid and binding *limited obligations* of the City" and "[t]he City shall repay all principal and interest on" those bonds "*solely from*" the additional tax revenues raised by the Measure C special taxes. (Italics added.) Accordingly, there is no language in those resolutions (nor any language omitted from proposed section 35.0210(g)) that would support CTAN's argument that the Measure C bonds would be general obligation bonds of the City instead of special fund or limited obligation bonds.[8]

Because Measure C (i.e., section 35.0210(g) proposed therein) and resolutions R-313486 and R-313487 clearly and unequivocally obligate the City to make payments on the Measure C bonds *only* from the special taxes imposed by Measure C and not from the City's general funds or other legally available funds, we conclude that the Measure C bonds would *not* be *general obligation bonds*, but instead "*obligations* which are *payable solely from a special fund* [or special funds]," for which the City would not be liable to make payments on out of its general funds or by tax levies if those special funds under Measure C would prove to be insufficient. (*City of Oxnard,*

---

[8]     To the extent CTAN asserts that the special fund doctrine can only apply when there is a specific agency, rather than a special fund, that is responsible for making, or obligated to make, payments on the bonds, it does not cite any case or other authority so holding and we are unpersuaded. In *City of Oxnard*, the Supreme Court held that the special fund doctrine applies to "obligations which are payable solely from a special fund, provided the governmental body is not liable to maintain the special fund out of its general funds, or by tax levies, should the special fund prove insufficient." (*City of Oxnard, supra*, 45 Cal.2d at p. 733.) In so holding, the court did not limit the special fund doctrine to obligations only of a specific agency that would be benefited, as opposed to a special fund overseen by a local agency (e.g., the Measure C special tax funds overseen by the City).

21

*supra*, 45 Cal.2d at p. 733, italics added.) As such, the Measure C bonds would not be "considered to be an indebtedness or liability of the political subdivision or agency issuing the bonds, within the meaning of the constitutional limitation." (*Ibid*.) Accordingly, we conclude that the trial court correctly found that the special fund doctrine applied to exclude Measure C and resolutions R-313486 and R-313487 from the two-thirds vote requirements of article XVI, section 18 of the California Constitution and section 99 of the San Diego City Charter.[9]

IV

*Measure C Is a Bona Fide Citizens' Initiative*

CTAN contends that the trial court erred by finding that Measure C is a bona fide citizens' initiative which requires only a simple majority vote of the electorate and not, as CTAN argued, a City-sponsored measure which requires a two-thirds vote.[10]

A

In *Alliance San Diego*, we assumed that Measure C is a citizens' initiative. (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 425.) Based on

---

[9] Because we conclude the trial court correctly found the special funds doctrine applied to exclude the Measure C bonds and resolutions R-313486 and R-313487 from the two-thirds vote requirement, we need not, and do not, address CTAN's additional argument that those bonds also would not be revenue bonds that would be exempt from the two-thirds requirement.

[10] Although CTAN also argued at trial and in its opening brief that Measure C also requires review under CEQA, its reply brief withdrew that argument. Accordingly, we do not address the merits of that argument. At oral argument, CTAN's counsel represented that CTAN's withdrawal of its CEQA argument also included a withdrawal of its challenge to the trial court's finding that CTAN had not carried its burden to show the City had substantial control over Measure C. We elect to address that issue despite CTAN's concession at oral argument.

that assumption, we concluded that the trial court erred by finding Measure C requires a two-thirds vote of the electorate and by granting the motion for judgment on the pleadings. (*Ibid*.) However, because our conclusion was based on the assumption that Measure C is a citizens' initiative and we found that the record was "*not sufficiently developed* to consider the challenge to that assumption raised by affirmative defense in [CTAN's] answer to the City's validation complaint," we reversed the judgment and remanded the matter for further proceedings. (*Id*. at p. 426, italics added.) We directed the trial court to consider on remand the issue of whether the City retained substantial control over the initiative process or otherwise acted in a way that shows Measure C is not a bona fide citizens' initiative. (*Id*. at p. 448.)

In its August 30, 2024 minute order, the trial court found, among other things, that CTAN had not met its burden to show the City had substantial control of Measure C within the meaning of *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider*). In particular, the court rejected CTAN's argument that the involvement of Jaymie Bradford, one of the five proponents of Measure C, indicated that the City had substantial control over the initiative. The court noted Bradford at that time was the executive vice president and chief operating officer of the San Diego Regional Chamber of Commerce and a volunteer director of the San Diego Convention Center Corporation (SDCCC). The court found that there was no indication that SDCCC or the City exerted any control over Measure C. In particular, a January 2020 resolution passed by SDCCC's board of directors expressing support for Measure C did not show either SDCCC or the City substantially controlled Measure C. Following its minute order, the court entered the validation judgment for the

23

City, finding, among other things, that Measure C "was duly enacted by the voters of the City of San Diego and is legal, valid, and binding."

## B

Under the California Constitution, the electorate retains the power of the initiative to adopt laws by a majority vote. (Cal. Const., art. II, §§ 1, 8, subd. (a), & 10, subd. (a); *City and County of San Francisco v. All Persons Interested in Matter of Proposition C* (2020) 51 Cal.App.5th 703, 709 (*Proposition C*).) The power of the initiative may be exercised by the electors of a city. (Cal. Const., art. II, § 11, subd. (a).) In particular, the electors of a city may exercise their initiative power to adopt a special tax by a simple majority vote. (*County of Alameda v. Alameda County Taxpayers' Assn., Inc.* (2024) 99 Cal.App.5th 226, 234 (*Alameda*) ["if a local special tax is imposed via citizens' initiative, only a simple majority vote is required to adopt it"]; *Alliance San Diego, supra*, 94 Cal.App.5th at p. 434 ["citizens' initiatives imposing special taxes need to be approved only by a simple majority" of the electorate]; *City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, 1070 (*Proposition G*); *Howard Jarvis Taxpayers Assn. v. City and County of San Francisco* (2021) 60 Cal.App.5th 227, 230–231 (*Howard Jarvis*); *City of Fresno v. Fresno Building Healthy Communities* (2020) 59 Cal.App.5th 220, 226, 231; *Proposition C,* at pp. 708–709, 715, 725.)

## C

For the simple majority vote requirement to apply to a measure imposing a special tax, that measure must qualify as a bona fide citizens' initiative. (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 448.) However, "the fact of a government official's involvement in an initiative does not necessarily convert a voter initiative into a local government initiative

24

without more." (*Ibid.*, fn. omitted.)  Recent court decisions have addressed the question of whether a tax initiative qualifies as a citizens' initiative rather than a government-sponsored measure.

In *Proposition G*, the defendant alleged that the school district conceived and promoted a parcel tax initiative and therefore that initiative required a two-thirds vote instead of a simple majority vote.  (*Proposition G, supra*, 66 Cal.App.5th at p. 1080.)  The defendant argued that the school district improperly appropriated the initiative and colluded with its teachers' union and others to pass it.  (*Ibid.*)  *Proposition G* concluded that it was irrelevant that the initiative's proponents had not drafted the ballot materials or personally paid the initiative's filing fees because there was no law that required its proponents to personally perform those acts.  (*Id.* at p. 1081.)  It was undisputed that the initiative's proponents were individuals who signed the notice of intent, caused it to be published, and submitted initiative petitions showing the required number of voter signatures for qualification of the initiative on the ballot.  (*Ibid.*)  *Proposition G* noted that there was no law precluding a governmental entity from publicly expressing its opinion regarding the merits of a proposed ballot measure.  (*Ibid.*)  The court concluded there was "nothing inherently sinister about the fact that the [school district] and the [teachers' union] supported this proposition."  (*Ibid.*)  *Proposition G* rejected the defendant's "nebulous and legally unsupported ground that the measure's official proponents did not play a sufficiently active role in securing its passage."  (*Id.* at p. 1082.)  Accordingly, it affirmed the trial court's judgment validating the parcel tax initiative that had received only a simple majority vote of the electorate.  (*Id.* at p. 1083.)

In *Howard Jarvis*, a member of the city's board of supervisors used his supervisor title and city hall address in submitting various documents as a

proponent of an additional tax initiative. (*Howard Jarvis, supra*, 60 Cal.App.5th at p. 239.) *Howard Jarvis* rejected the argument by the initiative's challengers that the initiative required a two-thirds vote because that elected official was involved in the initiative process. (*Id*. at pp. 239–242.) In so doing, the court rejected the challengers' reliance on *Rider, supra*, 1 Cal.4th 1, stating: "[W]e fail to see how the sponsorship and involvement of the single official here gives rise to the inference that the [c]ity intentionally circumvented Propositions 13 and 218 or effectively controlled the initiative." (*Howard Jarvis,* at p. 242.) The court further concluded that neither the text nor the ballot materials for Propositions 13 and 218 showed an unambiguous indication that the electors "intended to constrain the initiative power when an official is involved in the initiative process." (*Ibid*.) Accordingly, the court affirmed the trial court's judgment validating the tax initiative. (*Id*. at p. 243.)

In *Alameda*, the court rejected the challengers' argument that a sales tax initiative was not a bona fide citizens' initiative because a county supervisor was one of five proponents of the initiative and her chief of staff served as the principal officer of its campaign committee in his individual capacity. (*Alameda, supra*, 99 Cal.App.5th at pp. 230, 234.) In particular, the court rejected the argument that the initiative campaign was effectively controlled by local government in intentional circumvention of Propositions 13 and 218 and therefore the initiative was a local government measure subject to the two-thirds vote requirement. (*Id*. at p. 234.) *Alameda* concluded that the initiative was a voter initiative, and not a board initiative, because it was placed on the ballot by voter petition and approved by a majority of voters. (*Ibid*.) *Alameda* further concluded that separation of powers principles precluded it from declaring that the county's board of

supervisors enacted a specific tax measure when, in fact, that board never voted to enact it.  (*Ibid.*)

D

In *Alliance San Diego*, we briefly referred to *Rider* in support for our statement that "too much government involvement can mean an initiative is really presented by local government."  (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 448.)  In *Rider*, the court addressed circumstances in which the Legislature created an agency for the sole purpose of adopting an ordinance, to be approved by a simple majority vote of San Diego County voters, imposing a supplemental sales tax for the construction of San Diego County justice facilities.  (*Rider, supra*, 1 Cal.4th at p. 5.)  The county retained substantial control over the operations and expenditures of that agency.  (*Id.* at p. 9.)  *Rider* addressed the question of whether that agency was a "special district" within the meaning of article XIII A, section 4 of the California Constitution, as adopted by Proposition 13, and thus its supplemental sales tax ordinance would be subject to its two-thirds vote requirement.  (*Rider,* at pp. 5, 10.)  Article XIII A, section 4 of the California Constitution provides in relevant part:  "Cities, counties and *special districts*, by a two-thirds vote of the qualified electors of such district, may impose *special taxes* on such district . . . ."  (Italics added.)  *Rider* stated that constitutional provision "was intended to circumscribe the taxing power of local government."  (*Rider,* at p. 6.)  *Rider* stated that the record supported the trial court's finding that the agency " 'was created solely for the purpose of avoiding the strictures of Proposition 13' " and the Court of Appeal's conclusion that the agency was " 'an empty shell' used by the county to exercise its own fiscal discretion."  (*Id.* at p. 8.)

27

*Rider* concluded that "the [a]gency must be deemed a 'special district' under [California Constitution, article XIII A,] section 4 . . . ." (*Rider, supra*, 1 Cal.4th at p. 10.) *Rider* stated that it was less concerned with the factual support for the trial court's finding of " 'purposeful circumvention' " by the Legislature in creating the agency than with the probable intent of the framers of Proposition 13. (*Id.* at p. 11.) *Rider* concluded the framers of Proposition 13 intended the term " 'special district' " to include a " 'special purpose' " district, like the agency in its case. (*Ibid.*) The court stated: "[W]e hold that 'special district' would include any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Ibid.*)

Regarding future cases alleging intentional circumvention of Proposition 13, *Rider* stated:

> "[W]e believe that courts may infer such intent [to circumvent Proposition 13] whenever the plaintiff has proved the new tax agency is *essentially controlled* by one or more cities or counties that otherwise would have had to comply with the supermajority provision of section 4 [of article XIII A of the California Constitution]. In determining whether such control exists, a variety of considerations may be relevant, including the presence or absence of (1) substantial municipal control over agency operations, revenues or expenditures, (2) municipal ownership or control over agency property or facilities, (3) coterminous physical boundaries, (4) common or overlapping governing boards, (5) municipal involvement in the creation or formation of the agency, and (6) agency performance of functions customarily or historically performed by municipalities and financed through levies of property taxes." (*Rider, supra*, 1 Cal.4th at pp. 11–12.)

*Rider* noted that "application of the 'essential control' test simply affords ground for reasonably inferring an intent to circumvent Proposition 13." (*Rider, supra*, 1 Cal.4th at p. 12.) After concluding the agency was a " 'special

district' " within the meaning of article XIII A, section 4, of the California Constitution, *Rider* further concluded the agency's supplemental sales tax was a " 'special tax[ ]' " within the meaning of that provision and therefore the ordinance required a two-thirds vote under that provision instead of the simple majority vote that it received. (*Rider,* at pp. 13–15.) Accordingly, *Rider* reversed the Court of Appeal's decision validating the agency's tax levy. (*Id*. at p. 16.)

E

Other courts have declined to apply *Rider*'s holding to cases involving special taxes imposed by citizens' initiatives. In *Alameda*, the court rejected the challengers' reliance on *Rider*, concluding that case was inapposite to its case because *Rider* had "nothing to do with initiatives." (*Alameda, supra*, 99 Cal.App.5th at p. 235.) *Alameda* stated:

> "The *Rider* court considered whether Proposition 13 [citation] applied to a special tax imposed by a regional financing agency. [Citation.] The case primarily turns on whether the agency was a 'special district' under article XIII A, section 4 [of the California Constitution]. The agency had been transparently designed to evade Proposition 13 by taking advantage of an earlier Supreme Court case that narrowly construed the term 'special district.' [Citations.] The *Rider* court recognized that [earlier case] had created a loophole, revisited the issue [citation], and concluded that the 'framers of Proposition 13, and the voters who adopted it' intended a broader definition of 'special district.' [Citation.]" (*Alameda,* at p. 235.)

29

*Alameda* distinguished *Rider* from the voter initiative case before it, concluding:

> "*Rider* is inapposite. Proposition 13 expressly applies to special districts. [Citation.] So the *Rider* court's holding—that the special district at issue must comply with Proposition 13—fits squarely within the language and intent of the constitutional language. [Citation.] But our case concerns a voter initiative, and the courts have uniformly concluded that the language and intent of Propositions 13 and 218 do not apply to voter initiatives. [Citation.] *Rider* does not cast doubt on those cases, much less give us license to invalidate an initiative. We thus stand by our conclusion in *Howard Jarvis*: *Rider* does not apply because 'neither the text nor ballot materials provide the requisite "unambiguous indication" that the enactors of Propositions 13 and 218 intended to constrain the initiative power when an official is involved in the initiative process.' [Citations.]" (*Alameda,* at pp. 235–236.)

In concluding *Rider* was inapposite to the questions in its case, *Alameda* "acknowledge[d] that our colleagues in the Fourth District, citing *Rider*, recently suggested that 'too much government involvement' could potentially 'convert a voter [tax] initiative into a local government initiative.' (*Alliance San Diego, supra*, 94 Cal.App.5th at pp. 447–448, 312 Cal.Rptr.3d 230.) For the reasons stated above, we disagree." (*Alameda, supra*, 99 Cal.App.5th at p. 236.)

## F

CTAN argues that the trial court erred by concluding Measure C was a bona fide citizens' initiative that was subject to only a simple majority vote instead of a two-thirds vote. In particular, it argues the evidence showed that the SDCCC is an "arm" of the City, members of SDCCC's board officially sponsored Measure C, and the policies advanced by Measure C are those of

the City.  Based thereon, CTAN argues that Measure C was a City-sponsored ballot measure enacting a special tax and therefore its authorization of bonds required a two-thirds vote under the California Constitution and the San Diego City Charter.

In support of its argument, CTAN cites *Boling v. Public Employment Relations Board* (2018) 5 Cal.5th 898 (*Boling*).  In *Boling*, the court stated: "Allowing public officials to purposefully evade the meet-and-confer requirements of the [Meyers-Milias-Brown Act] by officially sponsoring a citizens' initiative would seriously undermine the policies served by the statute . . . ." (*Id*. at p. 918.)  However, as we previously concluded in *Alliance San Diego*, we do not find *Boling* helpful.  (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 448, fn. 16.)  As we noted, *Boling* involved the question of whether the City's mayor had violated the Meyers-Milias-Brown Act (MMBA) by not meeting and conferring with the employees' unions before determining a policy or course of action on issues affecting their terms and conditions of employment (i.e., by proposing an initiative that would eliminate defined-benefit pensions for new employees).  (*Ibid*.)  *Boling* concluded that the mayor had violated the MMBA.  (*Boling,* at pp. 918–919.)  Therefore, *Boling* did not address the question of whether the initiative proposed by the mayor qualified as a citizens' initiative and is therefore irrelevant to the instant question of whether Measure C is a bona fide citizens' initiative.  (*Alliance San Diego,* at p. 448, fn. 16.)

CTAN also cites *Rider* and asserts that it "support[s] the proposition that a government agency (through its public officials) cannot 'purposefully evade' the legal requirements that would otherwise be imposed on its legislative process by proposing and enacting policy through a 'citizens' initiative' (that brought it to fruition) unencumbered by those legal

31

requirements." We believe CTAN reads *Rider* too broadly. As discussed *ante*, *Rider* involved the question of whether an agency was a "special district" within the meaning of article XIII A, section 4 of the California Constitution, as adopted by Proposition 13, which would require the agency's measure proposing a supplemental sales tax ordinance to receive a two-thirds vote of the electorate. (*Rider, supra*, 1 Cal.4th at pp. 5, 10.) *Rider* did *not* involve the question of whether that measure qualified as a bona fide citizens' initiative within the meaning of the California Constitution. (Cal. Const., art. II, §§ 1, 8, subd. (a), & 10, subd. (a).) Accordingly, we decline, as did *Alameda* and *Howard Jarvis*, to apply *Rider*'s holding regarding special districts under Proposition 13 to the entirely different question of whether a tax measure is a bona fide citizens' initiative. (*Alameda, supra*, 99 Cal.App.5th at pp. 235–236; *Howard Jarvis, supra*, 60 Cal.App.5th at p. 242.)

In declining to apply *Rider* to this case, we acknowledge that our discussion of *Rider* in *Alliance San Diego* could be read as implicitly supporting the application of *Rider*'s factors in determining whether a tax initiative is substantially controlled by local government. (*Alliance San Diego, supra*, 94 Cal.App.5th at p. 448.) We stated: "[T]oo much government involvement can mean an initiative is really presented by the local government." (*Ibid*.) After citing *Rider* as an example, we stated: "From these cases [i.e., *Rider* and *Proposition G*], we understand that a government official's involvement must demonstrate substantial control for an initiative to be deemed a government action rather than a citizens' initiative."[11] (*Ibid*.) Accordingly, we directed the trial court on remand to

_____

[11] Although we also discussed the holding in *Proposition G*, there is nothing in the reasoning or holding of *Proposition G* that supports a conclusion that a government official's involvement may deem an initiative a government action rather than a citizens' initiative if that involvement shows

consider "whether Bradford's involvement suggests her government agency retained substantial control over the initiative process or otherwise acted in a way that shows Measure C was not a 'bona fide citizens' initiative.'" (*Ibid.*)

However, on further reflection, we now agree with, and adopt, the reasoning in *Alameda* and *Howard Jarvis* that *Rider* is inapposite to the instant question of whether a tax measure is a bona fide citizens' initiative and therefore decline to hold that its "substantial control" factors apply to this case. We believe that any such extension of *Rider* must come from the voters or, at least, a decision of our Supreme Court. Accordingly, we conclude that *Rider* does not support CTAN's argument that Measure C is not a bona fide citizens' initiative.

Here, the individual proponents of Measure C published a notice of intent to circulate an initiative petition, filed that notice with the city clerk, and subsequently submitted petitions signed by the requisite number of city voters (i.e., signatures of 71,646 registered voters). Measure C was thereafter placed on the ballot for the March 2020 election and received 65.24 percent of the votes. Given that all of those requisite steps for a citizens' initiative were satisfied (which CTAN does not dispute), nothing more was required for Measure C to be considered a bona fide citizens' initiative that required only a simple majority vote. (Cf. *Alameda, supra*, 99 Cal.App.5th at pp. 230, 234; *Proposition G, supra*, 66 Cal.App.5th at pp. 1080–1082; *Howard Jarvis, supra*, 60 Cal.App.5th at p. 239 [member of city's board of supervisors was proponent of initiative, submitted notice of intent to circulate petition, turned

_____

substantial control of that initiative. (*Proposition G, supra*, 66 Cal.App.5th at p. 1081 [stating no law precluded governmental entity from publicly expressing its opinion regarding merits of proposed ballot measure and noting there was "nothing inherently sinister about the fact that the [school district] and the [teachers' union] supported this proposition"].)

33

in signed initiative petition pages, signed ballot arguments in favor of initiative, and used his supervisor title and city hall address].) Contrary to CTAN's assertion, support of a citizens' initiative by a local government entity or local government official does not convert that citizens' initiative into a government-sponsored measure. (*Alliance San Diego,* 94 Cal.App.5th at p. 448; *Proposition G*, at p. 1081.) As the Yes Committee notes, government officials, such as SDCCC board members Bradford and Kim, retain First Amendment rights, including the right to advocate for an initiative and its adoption. (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 73; *Greisen v. Hanken* (9th Cir. 2019) 925 F.3d 1097, 1113.) Accordingly, we conclude that the trial court correctly found that Measure C is a bona fide citizens' initiative.

G

Nevertheless, assuming arguendo a tax initiative that is substantially controlled by a local government entity or local government officials must be deemed a government-sponsored measure subject to the two-thirds vote requirement, we conclude that CTAN failed to carry its burden to show the City or SDCCC (a nonprofit corporation controlled by the City) substantially controlled Measure C, thereby disqualifying it as a bona fide citizens' initiative. In particular, our independent review of the undisputed evidence shows that none of the *Rider* factors apply to show such substantial control.

On remand, the trial court granted the motion filed by the City and the Yes Committee to quash deposition subpoenas served by CTAN on Bradford and Kim.[12] The court then proceeded with a bench trial on the

---

[12] The court also sustained the Yes Committee's objections to certain hearsay evidence, consisting of various newspaper articles purportedly showing the support of Measure C by government officials (i.e., Bradford and Kim). Because that hearsay evidence was excluded from the evidence

34

administrative record. The evidence at trial showed, among other things, that Bradford was one of five proponents of Measure C. As a proponent of Measure C, Bradford represented herself as the executive vice president and chief operating officer of the San Diego Regional Chamber of Commerce, her employer. That chamber of commerce was a primary sponsor of Measure C. Although Bradford was also an unpaid volunteer member of SDCCC's board, there is no evidence showing that she openly cited that board membership as a proponent and supporter of Measure C. As to Kim, there is no evidence in the record showing that she was involved in proposing Measure C. Rather, it shows that she, at most, was also a member of SDCCC's board and voted in favor of a SDCCC board resolution supporting Measure C.

Contrary to CTAN's conclusory assertion, the described involvement of Bradford and Kim in supporting Measure C while they were members of SDCCC's board does not, in any sense of the term, constitute their "substantial control" over Measure C, much less substantial control that reasonably could be attributable to SDCCC or the City. Likewise, SDCCC's only action was a resolution passed by its board expressing its support of Measure C, which action alone cannot constitute "substantial control" over that initiative. In particular, we conclude that none of the six *Rider* factors described *ante* apply here based on the evidence of the involvement of Bradford, Kim, or SDCCC in proposing and/or supporting Measure C.[13] (*Rider, supra*, 1 Cal.4th at pp. 11–12.)

_____

considered by the trial court, we do not address or consider it in deciding the instant issue.

[13] CTAN also cites evidence showing that in 2004, 2011, and 2016, the City proposed various ballot measures that would have increased the transient occupancy tax, but those measures failed to receive the requisite number of votes. Contrary to CTAN's assertion, those previous unsuccessful

35

CTAN does not cite any apposite case law or other authority showing that the City or SDCCC had "substantial control" over Measure C based on the record in this case. As discussed *ante*, government entities and government officials are not precluded from expressing their opinions regarding the merits of proposed ballot measures. (See, e.g., *Proposition G, supra*, 66 Cal.App.5th at p. 1081.) Furthermore, we note that the involvement of Bradford and Kim in supporting Measure C was far less than the involvement in *Howard Jarvis* of the member of the city's board of supervisors who used his supervisor title and city hall address in submitting various documents as a proponent of an additional tax initiative. (*Howard Jarvis, supra*, 60 Cal.App.5th at p. 239.) In its circumstances, *Howard Jarvis* concluded that involvement of the city's board member did not support a finding that the "[c]ity intentionally circumvented Propositions 13 and 218 or effectively controlled the initiative." (*Id.* at p. 242; cf. *Alameda, supra*, 99 Cal.App.5th at pp. 230, 234; *Proposition G,* at pp. 1080–1082.) Accordingly, we conclude that the trial court correctly found that CTAN did *not* carry its burden to show that the City had "substantial control" over Measure C and therefore it did not qualify as a bona fide citizens' initiative.

V

*CTAN Has Not Carried Its Burden on Appeal to Show the Trial Court Prejudicially Erred by Excluding Certain Evidence*

CTAN contends that the trial court erred by excluding certain hearsay evidence that purportedly would show sponsorship and/or support of Measure C by Bradford and Kim. As explained *post*, we conclude that CTAN fails to show the court abused its discretion in excluding that hearsay

---

attempts by the City to raise taxes do not show that Measure C was a government-sponsored measure instead of a bona fide citizens' initiative.

36

evidence and also fails to argue, much less show, that the purported evidentiary error was prejudicial.

A

Evidence Code section 1200, subdivision (b) provides that hearsay evidence is inadmissible, except as provided by law.  Hearsay evidence is evidence of an out-of-court statement that is offered to prove the truth of its content.  (*People v. Sanchez* (2016) 63 Cal.4th 665, 674.)  Evidence Code section 1220 provides an exception to that hearsay rule when the hearsay evidence is offered against a party to the action, whether in his or her individual or representative capacity.  Evidence Code section 1250, subdivision (a)(2) provides another exception to the hearsay rule when the hearsay evidence is offered to prove or explain conduct of the declarant and is "a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health)."  Evidence Code section 1251, subdivision (a) provides a similar exception to the hearsay rule when the declarant is unavailable as a witness and the statements were of the declarant's state of mind, emotion, or physical sensation at a time prior to the statement, but only to prove that state of mind, emotion, or physical sensation.

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)  In particular, we review a trial court's decision to exclude hearsay evidence for

37

abuse of discretion. (*Doe v. Software ONE Inc.* (2022) 85 Cal.App.5th 98, 104, 109.)

"Claims of evidentiary error under California law are reviewed for prejudice applying the 'miscarriage of justice' or 'reasonably probable' harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243, that is embodied in article VI, section 13 of the California Constitution. Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred. [Citation.]" (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447 (*Christ*).)

B

On remand, the trial court sustained the Yes Committee's objections to hearsay evidence offered by CTAN (i.e., five newspaper articles purportedly showing involvement of Bradford and Kim in sponsoring and/or supporting Measure C). CTAN argues the trial court erred in excluding that hearsay evidence.

In a sole conclusory sentence, CTAN argues that the newspaper articles were admissible pursuant to an exception to the hearsay rule because Bradford and Kim were parties to the instant action or were authorized by a party to the action to make those statements on behalf of that party. We reject that argument. Neither Bradford nor Kim is a named party to this action, nor did CTAN show that their statements were authorized by a party (i.e., the City or the Yes Committee) to this action. Based on the record, we conclude that the trial court did not abuse its discretion by finding Bradford and Kim are nonparties to this action and did not act in a representative capacity on behalf of a party to this action within the meaning of Evidence Code section 1220.

Also, again in a sole conclusory sentence, CTAN argues the hearsay statements made by Bradford and Kim tend to show their state of mind, intent, plan, motive, and/or design in sponsoring and/or supporting Measure C and were therefore admissible pursuant to Evidence Code section 1250, subdivision (a)(2) and/or Evidence Code section 1251, subdivision (a) because they purportedly were unavailable to testify as a witness. However, CTAN did not raise that argument at trial and therefore forfeited that argument. (Cf. *Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038.) Nevertheless, CTAN does not show that either Bradford or Kim was unavailable to testify as a witness or that the hearsay evidence was offered to prove or explain their conduct. (Evid. Code, §§ 1250, subd. (a)(2), 1251, subd. (a).)

Importantly, we note that CTAN's arguments are wholly conclusory. An appellant forfeits contentions that are conclusory and supported only by counsel's opinion or argument without citation to any recognized authority. (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 (*Ewald*); *Dabney v. Dabney* (2002) 104 Cal.App.4th 379, 384.) Also, CTAN has not presented any substantive legal analysis showing that the trial court abused its discretion by excluding the hearsay evidence. "Where a point is merely asserted by [appellant] without any [substantive] argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 (*Ham*).) Because CTAN makes only conclusory arguments and does not make any substantive legal argument showing the trial court abused its discretion by excluding the hearsay evidence, we conclude that CTAN has both forfeited that contention and also failed to carry its burden on appeal to show the court erred.

Accordingly, we conclude that the trial court did not abuse its discretion by excluding the hearsay evidence.

C

Nevertheless, assuming arguendo the trial court erred by excluding the hearsay evidence, we conclude CTAN has forfeited any argument that the error was prejudicial because it does not make *any* argument that the error was prejudicial or *any* substantive legal argument on the issue of prejudicial error. (*Ewald, supra*, 13 Cal.App.5th at p. 948; *Ham, supra*, 7 Cal.App.3d at p. 783.) In any event, CTAN has wholly failed to carry its burden on appeal to show that it is reasonably probable that it would have received a more favorable result at trial had the error not occurred. (*Christ, supra*, 2 Cal.App.5th at p. 447.) Accordingly, we conclude that CTAN has not shown the purported evidentiary error was prejudicial and requires reversal of the judgment.[14]

---

[14] Because we dispose of CTAN's appeal on the grounds discussed *ante*, we need not, and do not, address the argument made by the Yes Committee in its respondent's brief that CTAN's invalidation claim improperly sought an unavailable remedy.

## DISPOSITION

The judgment is affirmed.  The Yes Committee shall recover its costs on appeal.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

DO, J.